UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.     : | Case No. 21-CR-353-JDB |
| : | |
| NICHOLAS LANGUERAND : | |
| : | |
| Defendant.   : | |

**UNITED STATES' MOTION FOR PROTECTIVE ORDER**

The United States of America hereby respectfully moves the Court for the entry of a protective order governing the production of discovery by the parties in the above-captioned case.

1. Defendant is charged via indictment with offenses related to crimes that occurred at the United States Capitol on January 6, 2021. In brief, on that date, as a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election, members of a large crowd that had gathered outside forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Scores of individuals entered the U.S. Capitol without authority to be there. As a result, the Joint Session and the entire official proceeding of the Congress was halted until the Capitol Police, the Metropolitan Police Department, and other law enforcement agencies from the city and surrounding region were able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials. This event in its entirety is hereinafter referred to as the "Capitol Attack."

2.      The investigation and prosecution of the Capitol Attack will likely be one of the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence. Over 300 individuals have been charged in connection with the Capitol Attack. The investigation continues and the government expects that at least one hundred additional individuals will be charged. While most of the cases have been brought against individual defendants, the government is also investigating conspiratorial activity that occurred prior to and on January 6, 2021. The spectrum of crimes charged and under investigation in connection with the Capitol Attack includes (but is not limited to) trespass, engaging in disruptive or violent conduct in the Capitol or on Capitol grounds, destruction of government property, theft of government property, assaults on federal and local police officers, firearms offenses, civil disorder, obstruction of an official proceeding, possession and use of destructive devices, and conspiracy.

3.      Multiple individuals charged or under investigation are: (a) charged or expected to be charged with crimes of violence; (b) associated with anti-government militia organizations and other groups (e.g., Proud Boys, Oathkeepers, Three Percenters, Cowboys for Trump) that deny the legitimacy of the United States government; (c) coordinated and/or participated in the violent events which took place at the Capitol; and (d) have made statements indicating an intention to continue in similar violent endeavors until the current administration is overthrown. Dozens of the individuals charged, including Defendant, have been detained pending trial because a judicial officer determined that the release of such person will not reasonably assure the appearance of the person, as required; will endanger the safety of any other person or the community; and/or will pose a risk of obstruction of justice.

4.  In connection with the above-described cases and on-going investigations, law enforcement and the government have obtained and continue to obtain voluminous amounts of information and evidence relating to both charged and uncharged individuals which may be discoverable pursuant to Federal Rules of Criminal Procedure 16 and 26.2, Local Criminal Rule 5.1(a), the provisions of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), and the Jencks Act, 18 U.S.C. § 3500. By way of illustration, such information and evidence includes but is not limited to: (a) more than 15,000 hours of surveillance and body-worn camera footage from multiple law enforcement agencies; (b) approximately 1,600 electronic devices; (c) the results of hundreds of searches of electronic communication providers; (d) over 210,000 tips; and (e) over 80,000 reports and 93,000 attachments related to law enforcement interviews of suspects and witnesses and other investigative steps.

5.  Many of the above-described materials may contain sensitive information, such as (a) personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure, as well as telephone numbers, email addresses, driver's license numbers, and similar unique identifying information; (b) information regarding the government's confidential sources; (c) information that may jeopardize witness security; (d) contact information for, photographs of, and private conversations with individuals that do not appear to be related to the criminal conduct in this case; (e) medical or mental health information, (f) sources and methods law-enforcement officials have used, and will continue to use, to investigate other criminal conduct related to the publicly filed charges; and (g) tax returns or tax information. Additional sensitive materials include surveillance camera footage from the U.S. Capitol Police's extensive system of cameras on U.S. Capitol grounds, s*ee* Attachment A (Declaration of Thomas A. DiBiase, General Counsel

3

for the United States Capitol Police), and repair estimates obtained from the Architect of the Capitol that constitute procurement information.

6.   Under the Federal Rules of Criminal Procedure, a court "may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief" relating to discovery by entering a protective order. Fed. R. Crim. P. 16(d)(1). "The burden of showing 'good cause' is on the party seeking the order[.]" *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015) (citations and alterations omitted). Once a showing of good cause has been made, the court has relatively unconstrained discretion to fashion an appropriate protective order. *See United States v. O'Keefe*, No. 06-CR-0249, 2007 WL 1239204, at *2 (D.D.C. Apr. 27, 2007) (describing the court's discretion as "vast"); *Cordova*, 806 F.3d at 1090 ("[A] 'trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect.'" (quoting *Alderman v. United States*, 394 U.S. 165, 185 (1969)).

7.   "Protective orders vary in range and type 'from true blanket orders (everything is tentatively protected until otherwise ordered) to very narrow ones limiting access only to specific information after a specific finding of need.'" *United States v. Bulger*, 283 F.R.D. 46, 52 (D. Mass. 2012). "Courts use protective orders . . . to expedite the flow of discovery in cases involving a large amount of sensitive information." *United States v. Johnson*, 314 F. Supp. 3d 248, 252 (D.D.C. 2018)(internal quotations and citations omitted).

8.   Courts also use protective orders when necessary to protect the integrity of on-going investigations. "[W]here public disclosure of certain materials might officially reveal the sources and methods law-enforcement officials have used, and will continue to use, to investigate other criminal conduct related to the publicly filed charges, courts have found it appropriate to

enter a protective order." *United States v. Smith*, 985 F. Supp. 2d 506, 531 (S.D.N.Y. 2013), citing *United States v. Bin Laden*, No. 98–CR–1023, 2001 WL 66393, at *2 (S.D.N.Y. Jan. 25, 2001)(noting that the court adopted a protective order because dissemination of discovery materials would "jeopardize the ongoing Government investigation into the activities of alleged associates of the Defendants").

9. In determining whether to issue a protective order, courts also take into account "the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security.'" *Cordova*, 806 F.3d at 1090 (citations and alterations omitted). "Considering the type of crime charged helps assess the possible threats to the safety and privacy of the victim. Defendants accused of securities fraud or shoplifting, for instance, may not pose as great a danger to victims as those charged with crimes of violence." *United States v. Dixon*, 355 F. Supp. 3d 1, 4 (D.D.C. 2019). "A long record of convictions for violent crimes may suggest a substantial danger to the safety of others. Similarly, a history of failures to follow court orders may justify a more restrictive protective order." *Id*.

10. In this case, there is good cause to enter the attached proposed protective order. The entry of the order will facilitate the government's ability to provide voluminous discoverable materials expeditiously, while adequately protecting the United States' legitimate interests. The Order is reasonable – In the event of a dispute, the Order authorizes the government to remove or reduce a sensitivity designation after a discussion with defense counsel. Further, whenever the redaction of specified information will resolve the basis for which a sensitivity designation was applied, the Order provides that the United States will agree to redaction, and such redaction will render the materials at issue no longer subject to the Order. In addition, the Order explicitly exempts materials that (1) are, or later become, part of the public court record, (2) were derived

directly from Defendant or that pertain solely to Defendant – e.g., Defendant's own financial records, telephone records, digital device downloads, social media records, electronic communications, arrest records, and statements to law enforcement, or (3) that the defense obtains by means other than discovery. Finally, the Order is clear that the burden for showing the need for any sensitivity designation always remains with the United States.

11. Defense counsel has stated that he is generally not opposed to the proposed protective order, but that he does oppose the proposed protective order's requirement that Defendant be required to sign Attachment A to the proposed order indicating his knowing and voluntary acceptance of the terms of the proposed order.

12. The Government submits that Attachment A provides an important enforcement mechanism for securing the safe handling of discovery. Defendant will have access to a large amount of discovery --- both specific to his own case and regarding Capitol Attack cases in general. Indeed, in order to comply with its discovery and disclosure obligations, the government intends to make voluminous materials available in all pending cases arising out of the events of January 6, 2021, including this one. These materials will include, but not limited to, thousands of videos collected in the multitude of investigations, as well as tips, witness statements, and the results of searches performed upon other individuals' devices and accounts.

13. Additionally, the COVID-19 pandemic continues to pose obstacles that render in-person meetings complicated at best. Due to these considerations, such wide-spread access of sensitive information creates the additional risk that sensitive information will be mishandled. As a result, the proposed protective order contemplates defendants will be given discovery in order to facilitate its review, but with restrictions placed on the use and handling of discovery labeled as sensitive and highly sensitive. Absent Attachment A, the Government would have to seek to

modify the protective order to further restrict the means by which the legal defense team can share sensitive information with Defendant. Rather than having direct access to sensitive materials, Defendant would only be able to view sensitive and highly sensitive discovery in the physical presence of the legal defense team.

14.     Defendant's written acceptance in Attachment A offsets those risks by ensuring he is aware of the protective order and exactly how he should treat the sensitive information.  The actual signing of Attachment A will highlight to Defendant the importance of following the limitations set forth in the protective order, as well as the seriousness of properly handling applicable discovery.

15.     Attachment A also ensures enforcement of the order by providing accountability if Defendant violates the order.  Without Attachment A, defense counsel would be a necessary witness to establish a knowing violation of the Order.  Counsel would have to establish that the order was properly explained to their client and that Defendant understood how the sensitive and highly sensitive information needed to be handled. With Attachment A, Defendant's signature would confirm that he understood the Order. Without such an acceptance on the record, Defendant could easily skirt responsibility for violating the order by asserting --- whether sincere or feigned --- that he was either unaware of the order or did not fully understand it.

16.     Moreover, the larger context of the Capitol Riots further demonstrates good cause for requiring Defendant to sign Attachment A.  On the day of the Riots, Defendant physically assaulted police officers defending the entrance to the Capitol for the purpose of entering the Capitol and preventing the certification of the election.  Such blatant disregard for the law and the legitimate functioning of the U.S. Government indicates a potential to disregard orders from this Court.  In this case, Defendant will necessarily be placed in a position of trust to properly handle

sensitive and highly sensitive discovery. His obligation to follow this Court's orders will be the only restraint guarding against mishandling such evidence, including the possibility of posting sensitive information on social media. Consequently, the very nature of the charged offenses provides further good cause to require Defendant's written acceptance of the protective order via Attachment A.

17.     Attachment A does not force Defendant to make statement against interest implicating the constitutional protections upheld in *Miranda v. Arizona*, 384 U.S. 436 (1966) or *Edwards v Arizona*, 451 U.S. 477 (1981). Proceedings conducted by this Court while defendants are represented by counsel are not custodial interrogations. By requiring Defendant to sign Attachment A, the Court would simply be ensuring Defendant understands its order, analogous to the Court engaging in a colloquy with a defendant when setting conditions of release to ensure the defendant understands the conditions and when they need to return to court.

18.     Nor does Attachment A violate the attorney-client privilege. Attachment A does not require Defendant to disclose any confidential communications or legal advice. It merely requires Defendant to acknowledge that he has reviewed the protective order with counsel, understands the protective order's provisions, and is satisfied with counsel's services with respect to review of the protective order. This is no different from when similar questions are asked in proceedings such as guilty pleas, and nothing about Attachment A forecloses Defendant's ability to seek relief down the road regarding any issues with the quality of defense counsel's representation.

WHEREFORE, to expedite the government's provision of discoverable materials, and to adequately protect the United States' legitimate interests, the government requests that pursuant to the Court's authority under Fed. R. Crim. P. 16(d)(1), the Court enter the attached proposed order.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By: /s/ *Robert Juman*
Robert Juman
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov