**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**NICHOLAS LANGUERAND,**<br><br>**Defendant.** | **Case No. 21-cr-353 (JDB)** |

**MEMORANDUM OPINION**

Defendant Nicholas Languerand faces a seven-count federal indictment arising from his participation in the events at the United States Capitol on January 6, 2021.  Shortly after his arrest in April 2021, a magistrate judge in the District of South Carolina ordered his detention pending trial.  Before the Court is Mr. Languerand's motion to revoke that detention order and release him subject to conditions.  See Def.'s Mot. for Revocation of Det. Order ("Def.'s Mot.") [ECF No. 18]. The government opposes this request, proffering video, photographic, and documentary evidence in support of its argument that Mr. Languerand "is both [a] risk of flight and a danger to the community."  See Gov't's Mem. in Opp'n to Def.'s Mot. to Revoke Det. Order ("Gov't Opp'n") [ECF No. 22] at 1.[1] The Court agrees with the government.  For the reasons set forth below, the Court will deny Mr. Languerand's motion.

---

[1] The government's opposition, as well as the eleven exhibits attached to it, were filed under seal.  See Min. Order (Aug. 4, 2021).  Some of these materials are referenced in this opinion.  The Court has consulted with the parties, however, and neither the United States nor Mr. Languerand object to the public release of this opinion.

**Factual Background**[2]

On January 6, 2021, defendant Nicholas Languerand actively participated in a riot at the U.S. Capitol while the U.S. Congress met inside to certify the vote count of the Electoral College in the 2020 presidential election.  Statement of Facts at 2–3.  Several photographs and videos show Mr. Languerand near the front of a cluster of approximately a dozen individuals fighting with police at the Capitol's Lower West Terrace archway around 5:00 P.M. on the evening of the 6th.[3] Id. at 3.

During the scrum, Mr. Languerand threw multiple objects at the officers trying to hold the archway.  First, Mr. Languerand picked up and hurled a red traffic bollard made of what appears to be semi-hard plastic toward the archway.  See id. at 4; Ex. 1A to Gov't Opp'n at 0:05–0:09.[4] The bollard ricocheted off the riot shield of an officer on the front line before colliding with multiple officers positioned further inside the archway.  Ex. 1A to Gov't Opp'n at 0:05–0:09; Ex. 1B to Gov't Opp'n at 0:09–0:12.  At another point, Mr. Languerand bent over, picked up what looks like a small canister, and threw it in the direction of the officers in the archway.[5]  Ex. 1A to

---

[2] The following factual summary relies on the Statement of Facts submitted alongside the initial criminal complaint filed against Mr. Languerand, see Statement of Facts [ECF No. 1-1], as well as the evidence proffered by the government in its opposition to defendant's motion, see Gov't Opp'n at 4–11.  The parties do not contest this evidence or descriptions at this stage, see Rough Tr. of Hr'g (Aug. 5, 2021) at 5 ("Hr'g Tr."), only the inferences to be drawn from them.  Thus, unless otherwise noted, the Court will take the proffered descriptions as true for the purposes of this motion.

Additionally, citations to the transcript of the August 5 hearing on this motion are to a rough draft of the transcript.  When finalized, the transcript will be posted to the docket.  Discrepancies between the rough transcript and the final version may exist.

[3] Mr. Languerand is identifiable in these videos by his clothing: a black sweatshirt over top of a plaid shirt, blue jeans, a black face mask, and, most importantly, a distinctive red and black knit hat.  See Statement of Facts at 2; Gov't Opp'n at 4–6.  Defendant's subsequent social media posts depict him wearing these clothes, see Statement of Facts at 2, and when federal agents searched his residence, they found items matching those in the videos.  See Gov't Opp'n at 6.

[4] Exhibits 1A and 1B of the government's opposition are videos and are thus unable to be filed using the ECF system.  Accordingly, counsel for the government provided these videos to the Court and opposing counsel by secure means and filed a "Notice of Filing of Items Incompatible with CM/ECF Filing" [ECF No. 21] on August 3, 2021.

[5] The government describes this as a "cannister [sic] of what appears to be pepper spray," Gov't Opp'n at 5, but after reviewing the video evidence proffered by the government, the Court declines to adopt this characterization

Gov't Opp'n at 0:19–0:23.  The videos then capture Mr. Languerand retrieving a stick-like object from the ground and throwing it at the officers, striking the officer on the left flank of the police formation.[6]  E.g., id. at 0:44–0:48.

In the ensuing weeks, Mr. Languerand made several social media posts advertising his presence at the Capitol on the 6th and seeking out other participants.  On January 19, Mr. Languerand, under the username "blessthisimmunity_17," posted to Instagram a picture of himself at the Capitol on January 6th with the caption "'Remember this day forever.' I love you guys." Statement of Facts at 2.  Using a very similar username, he posted the same picture on Reddit, asking "How many other wonderful Vermont Patriots were at the legendary and historical DC Storm?"[7]  Gov't Opp'n at 4.

On the basis of these social media posts, the FBI was able to identify Mr. Languerand in videos taken at the Capitol on January 6th.  Federal agents filed a criminal complaint against him on April 12, 2021, see Criminal Complaint [ECF No. 1], and three days later, he was arrested at his grandparents' home in South Carolina.  Gov't Opp'n at 6.  At that time, federal agents also searched Mr. Languerand's room, where they found the clothes visible in his social media posts

---

for present purposes.  The exact nature of this object, however, need not be determined at the present time and is, of course, subject to additional evidentiary development.  Elsewhere in the video, Mr. Languerand appears to throw a drink bottle at the officers holding the archway.  Ex. 1A to Gov't Opp'n at 0:29–0:36.  This conduct is not referenced in the Statement of Facts, nor does it appear to form the basis of, at least, Counts Two through Five of the Indictment against Mr. Languerand.  See Indictment as to Nicholas Languerand ("Indictment") [ECF No. 6].

[6] At another point in the riot, Mr. Languerand came into possession of a riot shield, hit it against the ground, and then brandished it between himself and a police officer.  See Statement of Facts at 4–5.  In the initial criminal complaint filed against Mr. Languerand, he was charged with converting property of the United States to his own use, in violation of 18 U.S.C. § 641, based on this action.  Id. at 5.  That charge is not, however, reflected in the Indictment, see Indictment, and the relationship between this incident and the charges actually pending against Mr. Languerand is unclear.

[7] A different Reddit post by "blessthisimmunity17" identifies the author as Nicholas Languerand.  Statement of Facts at 3.  On the basis of this self-identification as well as the other reasons set out in the Statement of Facts, see id. at 2–3, the Court does not doubt the government's assertion that these posts were made by Mr. Languerand, nor does defendant appear to contest his authorship of these posts, see Hr'g Tr. at 5.

and in the videos from the Capitol.  Id.  Also in defendant's room was an AR-15 semi-automatic rifle, two shotguns, ammunition for these weapons, a pistol case, a tactical vest, and brass knuckles, id. at 7,  as well as a notebook containing a cryptic, undated document mentioning "Washington DC Rally 0700," "emergency [s]upplies," and "Firearms." Id. at 6–7.

Law enforcement also seized and accessed Mr. Languerand's cell phone, which contained several references to the events of January 6th and to the FBI.  Id. at 7.  An undated "Note" on defendant's phone states: "If you are ok with fraudulently certifying an election to win, then I'm ok with attacking a government building to stop you." Id. at 8.  Two notes written in the months following January 6th then express hostility to the FBI's investigation of those events: a "poem" dated March 25 reads "Dear FBI, if you play nice, so will I. If you shoot my dog, we will all die," while an April 9 note states "The FBI should really find a better hobby than intimidating and persecuting the patriots who stood up for their constitutional rights and against the seditious infiltration of the psychopathic criminal mafia into the government that they have sworn to protect." Id. at 8–9.  The April 9 document is littered with references to various conspiracy theories and concludes with the phrase "Where We Go One, We Go All," a slogan used by adherents of the QAnon conspiracy theory.[8] Id. at 9.  The phone also contained pictures of leaders of the Proud Boys,[9] the logo of the militia organization the "Three Percenters,"[10] pictures of Nazi iconography,

---

[8] For the association of this phrase with QAnon, see Will Rahn & Dan Patterson, What is the QAnon conspiracy theory?, CBS News (March 29, 2021), available at https://www.cbsnews.com/news/what-is-the-qanon-conspiracy-theory/. Mr. Languerand also used this phrase, complete with the distinctive capitalization pattern, in a post on Reddit in which he identified himself by name.  See Statement of Facts at 3.

[9] The Proud Boys "describes itself as a pro-Western fraternal organization for men who refuse to apologize for creating the modern world," and members "routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values." United States v. Pezzola, No. CR 21-52-1 (TJK), 2021 WL 1026125, at *1 (D.D.C. Mar. 16, 2021) (citations omitted).

[10] "The Three Percenters are a domestic militia that advocates for resistance to the U.S. federal government polic[i]es it considers to infringe on personal, local, and gun ownership rights." United States v. Gieswein, Crim. A. No. 21-24 (EGS), 2021 WL 3168148, at *11 n.10 (D.D.C. July 27, 2021) (citation and quotation marks omitted).

and photos of Mr. Languerand wearing a Guy Fawkes mask and posing with firearms.[11]  See id. at 9–10.

With the consent of defendant's grandparents, federal agents also searched the trailer in Vermont where Mr. Languerand used to live.  Id. at 10.  There, agents found more notebook pages containing militaristic language seemingly referring to Washington, D.C.  One page was headed "(Obj Washington) (N & J)," followed by what appears to be coded language, examples of which include "diamond – road (waiting point)," "emerald – breach point," and "iron – N. obj cleared." See id. at 11.  Another page was titled "Target list" and included subheadings "Attack," "Breach," and "Assault"—the entries under these headings are incomprehensible alphanumeric character strings.  Id.  Outside the trailer, law enforcement found an old pickup truck and a makeshift target with the rough outline of a human, both "riddled with bullet holes."  Id. at 10–11.

Six days after his arrest, Magistrate Judge Thomas E. Rogers III of the District of South Carolina ordered that Mr. Languerand be detained prior to trial, finding that he was a flight risk and that he posed a danger to the community if released.  See Ex. 1 to Def.'s Mot. [ECF No. 18-1] at 3.  On May 12, Mr. Languerand was indicted by a federal grand jury on seven counts arising from his actions on January 6th: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapons, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted

---

[11] Though the photos themselves do not identify the masked person as Mr. Languerand, one photo appears to depict the subject wearing the same black sweatshirt with gold lettering that Mr. Languerand wore on January 6th. See Gov't Opp'n at 7.

Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).  See Indictment.

On August 2, Mr. Languerand filed the instant motion seeking to revoke Judge Rogers's detention order and asking this Court to release him from custody pending trial.[12]  The government filed an opposition the following day, and oral argument was held on August 5, 2021.  The motion is now ripe for adjudication.

## Legal Standard

A defendant detained by order of a magistrate judge may file "a motion for revocation or amendment to the order" with "the court having original jurisdiction over the offense."  18 U.S.C. § 3145(b).  The D.C. Circuit has not directly decided what standard governs a district court's review of a magistrate judge's detention order, see United States v. Munchel, 991 F.3d 1273, 1280 & n.3 (D.C. Cir. 2021), but courts in this District and in other circuits have uniformly held that the magistrate's order is reviewed de novo.  See, e.g., United States v. Klein, Crim. No. 21-236 (JDB), 2021 WL 1377128, at *3 (D.D.C. Apr. 12, 2021); Gieswein, 2021 WL 3168148, at *6.

Pre-trial detention is governed by the Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, which limits detention to those "defendants charged with crimes that are 'the most serious' compared to other federal offenses."  Klein, 2021 WL 1377128, at *3 (quoting United States v.

---

[12] Defendant's motion principally raised constitutional arguments against his continued detention.  See, e.g., Def.'s Mot. at 10–11, 13.  At oral argument, however, defense counsel backed away from those contentions, clarifying that he is "not insisting that there is some constitutional issue that has been missed."  Hr'g Tr. at 3.  On the basis of that representation, the Court will not address the constitutional argument raised in the motion and instead will focus, as both parties did at oral argument, on the statutory factors set out in 18 U.S.C. § 3142(g).

Singleton, 182 F.3d 7, 13 (D.C. Cir. 1999)).  Section 3142 provides that a detention hearing must be held if a case involves certain enumerated categories of offenses, including, as relevant here, a "crime of violence." 18 U.S.C. § 3142(f)(1)(A).[13]  The purpose of such a hearing is to "determin[e] whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. § 3142(g).  If there are no such conditions, the court "shall order the detention of the person before trial." Id. § 3142(e)(1).

In short, "the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019).  When making this determination, the court "shall . . . take into account the available information concerning" four specified factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).  The government bears the burden to justify pre-trial detention: it must either "prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community,'" Munchel, 991 F.3d at 1280 (quoting 18 U.S.C. § 3142(f)), or it must show by a preponderance of the evidence "that an individual is a flight risk," Vasquez-Benitez, 919 F.3d at 551 (citing United States v. Vortis, 785 F.2d 327, 328–29 (D.C. Cir. 1986) (per curiam)).  In assessing a defendant's dangerousness, it is necessary for "the government to establish that the

---

[13] Mr. Languerand does not dispute that he is eligible for pretrial detention.  It is settled law that using a dangerous weapon to forcibly assault an officer of the United States in violation of 18 U.S.C. § 111(b) qualifies as a "crime of violence" for purposes of the Bail Reform Act. See, e.g., United States v. Padilla, Crim. No. 21-214 (JDB), 2021 WL 1751054, at *5 (D.D.C. May 4, 2021); Gieswein, 2021 WL 3168148, at *8; see also United States v. Quaglin, 851 F. App'x 218, 218 (D.C. Cir. 2021) ("Appellant is charged with violating 18 U.S.C. § 111(b) – an offense which is categorically a crime of violence.").

defendant poses a continued 'articulable threat to an individual or the community' that cannot be sufficiently mitigated by release conditions." Padilla, 2021 WL 1751054, at *4 (quoting Munchel, 991 F.3d at 1280); see also United States v. Hale-Cusanelli, 3 F. 4th 449, 456 (D.C. Cir. 2021) (characterizing the dangerousness inquiry as a "forward-looking determination about the serious risk" posed by a defendant's release).

## Analysis

### I.   Danger to the Community

#### a.   Nature and Circumstances of the Offense

The first factor to consider under § 3142(g) is the "nature and circumstances of the offense charged," including "whether the offense is a crime of violence."  18 U.S.C. § 3142(g)(1).  In assessing the pre-trial detention of January 6th defendants, this Court, like many other courts in this District, has considered six, non-exclusive "guideposts" set forth by Chief Judge Howell in United States v. Chrestman, Case No. 21-mj-218 (ZMF), 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021).  The Chrestman factors are designed to "differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6." Klein,  2021 WL 1377128, at *7. They include whether a defendant:

> (1) has been charged with felony or misdemeanor offenses; (2) engaged in prior planning before arriving at the Capitol; (3) carried or used a dangerous weapon during the riot; (4) coordinated with other participants before, during, or after the riot; or (5) assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct; and (6) the nature of the defendant's words and movements during the riot. . . .

Id. (quoting Chrestman, 2021 WL 765662, at *7–8) (internal quotation marks omitted).

The charges pending against Mr. Languerand are very serious—five of the seven counts in the Indictment are felonies.[14]  Although none give rise to a presumption of dangerousness under the Bail Reform Act, see 18 U.S.C. § 3142(e)(2), the felonies are undoubtedly grave offenses, each carrying the possibility of a multi-year prison sentence.  This factor thus weighs in favor of detention.

One reason for the seriousness of the charges against him is the fact that Mr. Languerand "carried or used a dangerous weapon during the riot."  The photographic and video evidence proffered by the government shows Mr. Languerand hurling several objects—including a large plastic bollard, a canister of some sort, and a stick-like object—at police officers attempting to hold the Lower West Terrace archway.  See Statement of Facts at 3–4; Ex. 1A to Gov't Opp'n.

Yet, although this conduct differentiates Mr. Languerand from those who did not engage in violence on January 6th, the projectiles at issue here are hardly the most concerning weapons used in the riot.  See, e.g., Gieswein, 2021 WL 3168148, at *10 (noting that the defendant "openly carried a baseball bat and carried and used a chemical spray on law enforcement officers"); see also Klein, 2021 WL 1377128, at *8 & n.8 (collecting cases in which January 6th defendants "sought to incapacitate and injure members of law enforcement by striking them with fists, batons, baseball bats, [or] poles").  Indeed, Mr. Languerand's objects are not even the most dangerous weapons visible in the videos proffered by the government, which depict, for instance, an individual hammering at an officer's riot shield with a baseball bat.  Ex. 1A to Gov't Opp'n at 0:18–0:25.

---

[14] The only two misdemeanor charges are the two violations of 40 U.S.C. § 5104(e)(2): Disorderly Conduct in a Capitol Building and Act of Physical Violence in the Capitol Grounds or Buildings.  See 40 U.S.C. § 5109(b) (prescribing maximum penalty of six months' imprisonment for violations of § 5104(e)(2)); see also Gov't Opp'n at 1–2.

To be sure, the mere decision to utilize an object as a weapon against law enforcement is a very serious offense, and Mr. Languerand's projectiles were far from harmless: the plastic bollard he hurled at the officers was particularly substantial.  See, e.g., id. at 0:06–0:08.  But while this factor undoubtedly sets Mr. Languerand apart from the many rioters who used no weapons at all, it weighs only moderately in favor of detention.

There is some evidence that Mr. Languerand engaged in planning before arriving at the Capitol, but the precise nature of this "planning"—and indeed the meaning of the government's proffered evidence—is unclear.  The government relies on two notebooks, one found in South Carolina and one found at defendant's former residence in Vermont.  These documents contain cryptic, seemingly militaristic language referring to Washington, D.C., see Gov't Opp'n at 7, 11, but it is difficult to meaningfully interpret them further, as neither is dated and both appear to be written in some kind of code.

The proffered notebooks do indicate that Mr. Languerand was "not just caught up in the frenzy of the crowd."  Chrestman, 2021 WL 765662, at *8.  Rather, these documents suggest that defendant had contemplated some form of violence against the nation's capital.  They do not, however, support any more specific finding of "planning" for his activities on the 6th.  Notably, Mr. Languerand was dressed in plain clothes during his altercation at the Capitol; unlike the defendants in Chrestman and Gieswein, there is no evidence that Mr. Languerand brought any weapons, tactical gear, or other combat supplies with him to Washington.  See id. at *15; Gieswein, 2021 WL 3168148, at *10 ("[The defendant's] decision to arrive at the Capitol on January 6, 2021 wearing specialized gear and carrying weapons suggests that he . . . came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process." (citation and

quotation marks omitted)).   This <u>Chrestman</u> factor thus weighs only marginally in favor of detention.

Relatedly, there is no evidence that Mr. Languerand "coordinat[ed] with other participants before . . . the riot," nor does it appear that he did so on the 6th.  The government disagrees, contending that Mr. Languerand's "attacks on law enforcement were coordinated with other rioters" because his conduct took place "in conjunction with [a] crowd of rioters gathered at the Lower West Terrace archway."  Gov't Opp'n at 13.  But violent conduct in the midst of a crowd is simply in the nature of a riot—the government's broad interpretation of "coordination" would sweep in nearly every January 6th defendant who engaged in any violence, fatally weakening the <u>Chrestman</u> factors' value in differentiating between the <u>varying</u> levels of culpability among January 6th defendants.  Without more specific evidence of coordination (such as group planning, tactical movements, or simultaneous communication), this factor does not favor pre-trial detention. <u>Cf.</u> <u>Chrestman</u>, 2021 WL 765662, at *2–3 (defendant, along with the other members of his group, wore a helmet marked with orange tape, strategically changed headgear, and removed a flag from his weapon during course of riot); <u>Pezzola</u>, 2021 WL 1026125, at *7 (defendant "bought a radio device that could be used to communicate with other members of [the Proud Boys]" and then "[wore] an earpiece on January 6"); <u>United States v. Caldwell</u>, Crim. A. No. 21-181 (CKK), 2021 WL 2036667, at *8 (D.D.C. May 21, 2021) (defendant "us[ed] a Baofeng radio during the riot . . . support[ing] an inference that [he] was coordinating with other rioters").

The government also contends that Mr. Languerand, by choosing to engage in violence while other protestors behind him did not, took on a "leadership role with respect to the rioters behind him," Gov't Opp'n at 13, even though the government concedes that Mr. Languerand did not "verbally encourage[] violence," Hr'g Tr. at 11.  The Court is not persuaded.  Like the

government's understanding of "coordination," this argument sweeps far too broadly, applying to potentially every violent rioter on January 6th and essentially nullifying this useful consideration.

Although verbal encouragement of violence is not the only way for a January 6th defendant to have taken on a "leadership role," conduct that can constitute de facto leadership is different in kind from the (nonetheless troubling) actions of Mr. Languerand.  For instance, a defendant who "was the first to pull [an] officer away from his post and into the crowd," kicking off a frenzy of beatings by others around him, is properly deemed to have "assumed a de facto leadership role." See United States v. Whitton, Crim. A. No. 21-35-5 (EGS), 2021 WL 1546931, at *8 (D.D.C. Apr. 20, 2021).  But this is the exception.  Even "pointing to others attempting to break through [a Capitol window] and "urg[ing] the mob to advance on retreating law enforcement officers . . . by waving his arms forward" has been found insufficient to constitute "leadership."  Gieswein, 2021 WL 3168148, at *11.  The government has not alleged any conduct by Mr. Languerand rising to the level of de facto leadership.  Mere presence on the front lines is not enough to weigh in favor of detention here.  See United States v. Sabol, Crim. A. No. 21-35-1 (EGS), 2021 WL 1405945 at *13 (D.D.C. Apr. 14, 2021) (rejecting a similar argument).

The final Chrestman factor is something of a catch-all: the court assesses "the defendant's words and movements during the riot" in an effort to gauge the "egregiousness of his conduct" and the "extent of a defendant's disregard for the institutions of government and the rule of law." Chrestman, 2021 WL 765662, at *8.  Mr. Languerand's actions on January 6th place him somewhere in the middle of the spectrum of "egregiousness."

Defendant's decision to engage in violence in order to subvert the orderly transition of power is the principal consideration here, and it weighs strongly in favor of detention.  Both the D.C. Circuit and other courts in this District have drawn a distinction between "those who actually

assaulted police officers" and those who merely "cheered on the violence or entered the Capitol after others cleared the way." Munchel, 991 F.3d at 1284 (citation omitted); see also Chrestman, 2021 WL 765662, at *8 ("The conduct of a defendant who injured, attempted to injure, or threatened to injure others . . . is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises."). Mr. Languerand's conduct indisputably puts him in the former Munchel category. Whereas other demonstrators hung back, Mr. Languerand placed himself among the front ranks of the rioters, violently confronting the police officers seeking to protect members of Congress and secure the Capitol.[15] Moreover, Mr. Languerand's actions unmistakably suggest an intent to harm those officers: "Intentional and purposeful assaultive conduct, particularly involving multiple incidents . . . are all indicia of dangerousness that may warrant pretrial detention." United States v. Owens, No. 21-CR-286 (BAH), 2021 WL 2188144, at *12 (D.D.C. May 28, 2021) (citing Padilla, 2021 WL 1751054, at *2).

But the Court does not agree with the government that Mr. Languerand belongs in "the most serious category of offenders." Gov't Opp'n at 12. Munchel's dichotomy between violent rioters and non-violent rioters, though an important consideration, is not the be-all and end-all of the § 3142 inquiry. See Padilla, 2021 WL 1751054, at *6 n.4 ("[T]he line drawn in Munchel [does not] absolve[] the district court of the need to probe the precise nature of a defendant's actions . . . ."). Not every January 6th rioter "necessarily pose[s] the same risk of danger," Hale-Cusanelli, 3 F.4th at 456, and each case requires a nuanced, fact-specific analysis. See Munchel,

---

[15] Defense counsel urged at oral argument that Mr. Languerand "did not personally injure anybody" during the riot, Hr'g Tr. at 6, but the Court considers that outcome to have been the result of defendant's bad aim and the officers' good fortune. The Court declines to give Mr. Languerand extra credit for his accidental failure to cause the harm he clearly intended to inflict. See Padilla, 2021 WL 1751054, at *8 ("That this attempt was unsuccessful is fortuitous but does not change the fact that Padilla intended to engage in violent conduct to harm others." (internal citation omitted)).

991 F.3d at 1283 (citing United States v. Tortora, 922 F.2d 880, 888 (1st Cir. 1990)).  As noted above, Mr. Languerand's projectiles, though clearly deployed as weapons against law enforcement, were not especially dangerous, at least not compared with the batons, baseball bats, bottles, flagpoles, and hockey sticks used by other rioters. See Klein, 2021 WL 1377128, at *8 & n.8 (collecting cases).  And although Mr. Languerand appears to have vaguely anticipated violence, the government has proffered no evidence suggesting that he helped to plan the riot or that he brought supplies or weapons with him to the Capitol.

Nonetheless, the fact that Mr. Languerand could have been more culpable does not mean he is not dangerous.  Cf. Hale-Cusanelli, 3 F.4th at 456 (rejecting the suggestion that "January 6 defendants should get the special treatment of an automatic exemption from detention if they did not commit violence on that particular day").  "It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy," Munchel, 991 F.3d at 1284, and Mr. Languerand's active participation in that event "evince[s] a clear disregard for the law, an aversion to the fundamental tenets of our democracy, and a willingness to act violently when he believes he is 'fighting tyranny,' all of which indicate that he poses a danger to the community," Sabol, 2021 WL 1405945, at *13.  Indeed, "if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." United States v. Fairlamb, Case No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).  So although Mr. Languerand's conduct was not as egregious as it might have been, the Court concludes that the nature and circumstances of his offenses weigh in favor of his continued detention.

   b.  The Weight of the Evidence

The second factor to be considered under § 3142(g) is "the weight of the evidence against the person."  18 U.S.C § 3142(g)(2).  The government contends that this factor "clearly weighs in

favor of detention," as "[t]he evidence against the defendant is overwhelming."  Gov't Opp'n at

14.  The Court agrees.  Mr. Languerand has repeatedly confirmed his presence at the Capitol

through posts on social media, and he is clearly identifiable in several videos of the event, thanks

to a conspicuous red and black hat later found at his residence.  Id. at 3–6; Exs. 1A & 1B to Gov't

Opp'n.  In sum, this factor too weighs in favor of detention, even though it "is the least important"

of the four § 3142(g) considerations.  Klein, 2021 WL 1377128, at *10 (citation omitted).

    c.   <u>History and Characteristics of the Defendant</u>

The third consideration in weighing pre-trial detention under § 3142(g) is the defendant's

"history and characteristics," including his "character, physical and mental condition, family ties,

employment, financial resources, length of residence in the community, community ties, past

conduct, history relating to drug or alcohol abuse, criminal history, and record concerning

appearance at court proceedings."  18 U.S.C. § 3142(g)(3).

Mr. Languerand's "past conduct" is particularly concerning to the Court.  Over the past

several years, Mr. Languerand has exhibited a distinct tendency toward threatening and violent

conduct.  In 2019, he was the subject of a protective order issued by the Vermont Superior Court

based on a complaint alleging a pattern of threats, harassment, and stalking.[16]  See Ex. 3 to Gov't

Opp'n [ECF No. 22-3] at 3–4; Ex. 4 to Gov't Opp'n [ECF No. 22-4] at 1–2.  Following a hearing

(which Mr. Languerand did not attend),[17] the Vermont Superior Court granted the requested order,

---

[16] Among other things, the complaint alleged that Mr. Languerand had sent "threatening texts saying he is going to kill me, himself, or other people I associate with," and it related one particular incident when Mr. Languerand repeatedly threatened to kill the complainant if she attended a certain party.  Ex. 3 to Gov't Opp'n at 3–4.  At a different time, Mr. Languerand allegedly "pounded on [the complainant's] door uncontrollably so [she] had no choice but to open it," at which point Mr. Languerand shoved his dog's food bowl into her stomach and "made [her] take [his] dog" for the rest of the day.  Id. at 5.

[17] The Vermont court's findings include the statement that "the Defendant was provided with reasonable notice and opportunity to be heard" at this hearing.  See Ex. 4 to Gov't Opp'n at 1.  This failure to attend, though not a direct analogue to the present proceeding, does weigh against Mr. Languerand under § 3142(g)(3)(A).

finding that Mr. Languerand had "[c]aused [the plaintiff] physical harm," "[p]laced [her] in fear of imminent serious physical harm," and "[s]talked Plaintiff."  Ex. 4 to Gov't Opp'n at 2–3.  Then, three months later, Mr. Languerand was charged with aggravated assault for an incident in which he beat an acquaintance while they were both riding in a car.  See Ex. 6 to Gov't Opp'n [ECF No. 22-6] at 3–4.

Mr. Languerand has also exhibited a concerning pattern of following conspiracy theories into belligerent confrontations with the people around him.  Mr. Languerand appears to be a devotee of the QAnon conspiracy theory, see Gov't Opp'n at 7; supra n.8, and his past conduct demonstrates a preoccupation with false allegations of pedophilia and child sex trafficking.  Of course, Mr. Languerand has every right to believe whatever he wants, but he does not have a right to accost and threaten individuals he thinks support pedophilia.  In the months preceding January 6th, for instance, Mr. Languerand "yell[ed] at [Black Lives Matter] protestors about pedophilia," Ex. 9 to Gov't Opp'n [ECF No. 22-9], and left a menacing voicemail for a Morristown, VT, city employee about purported pedophilic symbols on road barriers, telling the employee that "[Languerand] will be watching [him] and knows what he looks like,"  Ex. 11 to Gov't Opp'n [ECF No. 22-11] at 2.  In one particularly concerning incident, Mr. Languerand repeatedly threatened the proprietors of a pizza restaurant via messages on Instagram before "[coming] to the restaurant and . . . shouting about how they were running a child sex slave operation in their basement." [18]  Ex. 10 to Gov't Opp'n [ECF No. 22-10].  In response to an inquiry about this last

---

[18] These claims of sex trafficking in the basement of a pizza restaurant mirror similar claims surrounding the Comet Ping Pong restaurant in Washington, D.C., a conspiracy theory colloquially known as "Pizzagate."  Indeed, Mr. Languerand's decision to act on these claims resembles the (much more serious) actions of Ryan Jaselskis and Robert Maddison Welch, who each entered Comet Ping Pong and, respectively, fired a gun and attempted to set a fire. See Det. Mem. [ECF No. 5], United States v. Jaselskis, 1:19-cr-64-TJK (D.D.C. Feb. 26, 2019); Compl. Statement of Facts [ECF No. 1-1], United States v. Welch, 1:16-cr-847-KBJ (D.D.C. Dec. 12, 2016).

incident, the Lamoille County Sheriff's Department told the Burlington Police that "they deal with [Mr. Languerand] on a frequent basis, all for similar behavior."  Id.

Actions demonstrating a "willing[ness] to allow . . . personal beliefs [to] override the rule of law" weigh against a defendant seeking pre-trial release.  See Klein, 2021 WL 1377128, at *10. This is especially the case when that willingness is evinced by a pattern of behavior rather than one-off involvement in the January 6th riot.  See Hale-Cusanelli, 3 F.4th at 454–57 (affirming pre-trial detention of defendant in part because of his previous violent and racially tinged conduct); Fairlamb, 2021 WL 1614821, at *7 ("[A] defendant's history of violence offers some of the strongest evidence of his future dangerousness."); see also Gieswein, 2021 WL 3168148, at *16 (finding that the defendant's "history and characteristics" weighed against detention because "Mr. Gieswein's actions on January 6, 2021 stand in direct conflict with his history").  And though Mr. Languerand's "belief in conspiracy theories is concerning when considered in the context of this case," Gieswein, 2021 WL 3168148, at *16,  more important than the content of his beliefs is Mr. Languerand's clear tendency to act on them.  Indeed, as Judge Sullivan recognized in Gieswein, the relevant inquiry is not what the defendant thinks but whether his "history and characteristics reflect an ability to abide by the law."  Id.  Mr. Languerand's past conduct, especially in combination with his actions on January 6th, thus casts serious doubt on his ability to resist his violent inclinations and conform his conduct to law.

Finally, Mr. Languerand's past conduct demonstrates a deep distrust and hostility toward law enforcement.   The government has proffered various police reports describing Mr. Languerand's less-than-friendly interactions with law enforcement officers.  On March 3, 2019, Mr. Languerand "became extremely hostile" during a traffic stop, "yell[ing] and scream[ing] profanity at [the officers]" and later telling them that he "hates cops." Ex. 5 to Gov't Opp'n [ECF

No. 22-5].  In May 2020, Mr. Languerand told a sheriff's deputy responding to a call that "he didn't give a fuck who [the deputy] was and what [he] was doing."  See Ex. 7 to Gov't Opp'n [ECF No. 22-7].  Then, when defendant's dog approached the officer, Mr. Languerand, in a statement presaging the "poem" he wrote about the FBI in March 2021, said "if you shoot my dog I'll shoot you."  Id.  Defendant's attacks on law enforcement on January 6th and his ongoing hostility to the FBI, see Gov't Opp'n at 8–9, thus appear to be part of a broader pattern of disrespect and belligerence toward law enforcement.

The Court acknowledges, as defense counsel noted at oral argument, that these incidents "have not resulted in criminal convictions."  Hr'g Tr. at 9:22–10:1.  Yet the fact that police have received at least half a dozen calls regarding Mr. Languerand's belligerent and threatening behavior in the past eighteen months is nonetheless a troubling indication of his tendency toward violent confrontation.  Furthermore, though not a "criminal conviction" per se, the protective order entered against Mr. Languerand in 2019 includes judicial findings that he "physical[ly] harm[ed]," threatened, and stalked the complainant in that matter.  Counsel's categorical statement that none of Mr. Languerand's prior altercations "caus[ed] physical injury to anyone else," Hr'g Tr. at 7:6–10, is thus untrue.  See also Ex. 6 to Gov't Opp'n (describing how defendant physically assaulted an acquaintance in a moving car and then left him on the side of the road).  To the extent that some of Mr. Languerand's victims have emerged from their encounters with him unharmed (if also afraid), the Court considers that a matter of their good fortune rather than an indication of Mr. Languerand's harmlessness.

Defendant's troubling history outweighs any points in his favor under § 3142(g)(3)(A). Mr. Languerand does have a home in South Carolina with his grandparents, but he had only lived there for four months before his arrest, he has very few "ties" to that "community," and the Court

sees little evidence of close "family ties" with anyone other than his grandparents. See Ex. 2 to Gov't Opp'n at 1–2. He also has a relatively stable employment history, see id., and, to his credit, Mr. Languerand's former employer is eager to rehire him should he be released, Hr'g Tr. at 4:15–5:1. Mr. Languerand is also a former member of the military, a relevant consideration under this factor, see Foy, 2021 WL 2778559, at *5; Padilla, 2021 WL 1751054, at *7–8, but his military service lasted only three years before terminating in an administrative separation, Ex. 2 to Gov't Opp'n at 2.

Although certain aspects of defendant's "history and characteristics" weigh in favor of release, the troubling pattern of violent conduct apparent from the evidence before the Court substantially outweighs those other considerations. Mr. Languerand's conduct on January 6th was not an aberration; it was the culmination of a troubling pattern of confrontational and violent behavior suggesting an "inability (or refusal) to exercise his independent judgment and conform his behavior to the law." United States v. Chansley, Case No. 21-cr-3 (RCL), 2021 WL 861079, at *10 (D.D.C. Mar. 8, 2021). The Court finds that defendant's history and characteristics point toward pre-trial detention.

### d. Nature and Seriousness of the Danger

The final factor to be considered under § 3142(g) is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). This is by its nature the broadest of the statutory factors, calling for an "open-ended assessment of the 'seriousness' of the risk to public safety." Padilla, 2021 WL 1751054, at *8 (quoting United States v. Cua, Crim. A. No. 21-107 (RDM), 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure . . . the safety of any other person and the community,'

it bears heavily on the Court's analysis." Cua, 2021 WL 918255, at *5 (quoting 18 U.S.C. § 3142(e)).

For many of the reasons stated in the previous section, the Court finds that this final factor also weighs in favor of detention.  Mr. Languerand's decision to engage in violence against law enforcement on January 6th, his pattern of belligerence and even violence toward members of the community, and his track record of hostility toward law enforcement all suggest that he poses a serious danger of engaging in similar conduct again if released.

Looking forward, the Court is particularly concerned that nothing seems to have changed for Mr. Languerand since January 6th.  Unlike many of the rioters now facing charges for their conduct, Mr. Languerand has expressed no remorse for his actions at the Capitol,[19] cf. Cua, 2021 WL 918255, at *4 (weighing defendant's deep remorse and regret in favor of pretrial release), nor has the Court been presented with any evidence that Mr. Languerand "chose to cooperate with law enforcement [or] voluntarily surrender," Padilla, 2021 WL 1751054, at *8 (citing Chrestman, 2021 WL 765662, at *14; Whitton, 2021 WL 1546931, at *11).  Rather, in the months since January 6th, Mr. Languerand has repeatedly referred to himself and his fellow rioters as "Patriots," see Gov't Opp'n at 4, and, in a note written less than a week before his arrest, Mr. Languerand accused the FBI of "persecuting the patriots who stood up for their constitutional rights [on January 6th]."  Gov't Opp'n at 7–8.

Likewise, there is no indication that Mr. Languerand has given up the conspiracy theories which have led him into the confrontations described above.  Importantly, these theories, along

---

[19] The Court notes here, as it did in Klein, that "it is [Mr. Languerand's] constitutional right to challenge the allegations against him and hold the government to its burden of proof."  Klein, 2021 WL 1377128, at *11 (citing United States v. Lawrence, 662 F.3d 551, 562 (D.C. Cir. 2011)).  The Court is not "punish[ing]" Mr. Languerand's "failure to express remorse," id. (quoting Lawrence, 662 F.3d at 562), but rather noting that defendant's ongoing pride in his actions on January 6th is probative of his likelihood to engage in similar conduct again if released.

with the militia organizations with whom Mr. Languerand appears to sympathize, not only advance falsehoods but affirmatively justify violence against lawfully constituted authorities.[20]  And even more troublesome, January 6th was not the first time defendant has <u>acted</u> on those theories—Mr. Languerand has repeatedly demonstrated that he is willing to use confrontational behavior and violence in the service of his beliefs.

The foregoing is sufficient for the Court to conclude that Mr. Languerand would pose an "articulable threat to the community" if released.  <u>Munchel</u>, 991 F.3d at 1282.  This standard does not require a defendant to have made explicit threats of a specific future act, nor does it require the Court to find that January 6th will repeat itself if the defendant is released.  Rather, the pattern of defendant's prior behavior, the culmination of that pattern on January 6th, and his failure to repudiate either his actions at the Capitol or the beliefs that justify such conduct are sufficient for the Court to conclude that Mr. Languerand poses an articulable threat to engage in similar violent, confrontational behavior if released.

The weapons found in his room in South Carolina heighten the seriousness of this threat.  Although he has volunteered to relinquish those (lawful) weapons as a condition of release, <u>see</u> Hr'g Tr. at 5:2–5, the very fact that Mr. Languerand acquired and possessed an assault rifle, two shotguns, ammunition, and brass knuckles is indicative of the magnitude of the threat posed by his willingness to promote his beliefs through violent confrontation.  The danger is not of fisticuffs but of deadly force.  And even if Mr. Languerand did surrender his weapons, his conduct both before and on January 6th "establishes that, even without possessing weapons in his home or

---

[20] Although there is no evidence that Mr. Languerand is a member of or has had any contact with the Proud Boys or Three Percenters, the presence of those groups' symbols on his phone suggests at the very least sympathy with their goals.  <u>See</u> Gov't Opp'n at 9.  For more on the aims and methods of these organizations, <u>see</u> <u>supra</u> notes 9–10.

resorting to extensive planning in advance, he has both the 'resources and capabilities'" to harm members of his community.  See Padilla, 2021 WL 1751054, at *9 (quoting Munchel, 991 F.3d at 1283).

Although defense counsel has put forward an extensive list of conditions the Court could impose on Mr. Languerand, see Def.'s Mot. at 12–13; Hr'g Tr. at 5:2–10, the Court harbors substantial doubts about defendant's willingness to comply with these conditions.[21]   Mr. Languerand's negative opinion of police and of the FBI is readily apparent, and, if anything, the law enforcement response to January 6th has only deepened his feelings of hostility, particularly toward federal law enforcement.  See Gov't Opp'n at 7–8.  According to Mr. Languerand, the FBI is engaged in "persecuting . . . patriots" and protecting the "seditious infiltration of [a] psychopathic criminal mafia into the government."  See id. at 8.  Such does not augur well for his compliance with federally mandated release conditions.  Even though it is unclear to what extent his ire applies to federal law enforcement writ large, the Court is not willing, especially in light of defendant's pattern of disrespect toward law enforcement, to stake the very real community safety concerns posed by Mr. Languerand on his word that he will obey restrictive conditions of pre-trial release.  Likewise, the Court agrees with the government that Mr. Languerand's use of cocaine while in the military, see Ex. 2 to Gov't Opp'n at 3, is probative of his likelihood to comply with the release conditions imposed by this Court.  See Hr'g Tr. at 11:24–12:10.  The Court finds it unlikely that release to the custody of his grandparents will succeed in changing Mr. Languerand's behavior where the strict regulations of military life failed.

---

[21] Though the Court appreciates the willingness of his grandparents to serve as third-party custodians, see Hr'g Tr. at 4:3–13, it was at his grandparents' house in South Carolina where Mr. Languerand successfully stockpiled weapons, see Gov't Opp'n at 6–7.  Having a loving home simply does not address the Court's concerns about the threat Mr. Languerand poses to public safety.  Cf. Hr'g Tr. at 17:12–17

For these reasons, the Court finds that the government has met its burden of "prov[ing] by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community." Munchel, 991 F.3d at 1280 (internal quotation marks and citation omitted).

## II.   **Flight Risk**

In addition to posing a danger to the community if released, a defendant may be detained pending trial if a court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e)(1). In assessing flight risk under § 3142, "the Court considers the same four factors under § 3142(g) that were integral to the dangerousness analysis." Padilla, 2021 WL1751054, at *11 (citing Vasquez-Benitez, 919 F.3d at 550–51). "A determination that an individual is a flight risk must be supported by a preponderance of the evidence." Vasquez-Benitez, 919 F.3d at 551. The government argues that Mr. Languerand's lack of connection to any given place, his history of moving around, and the hefty sentence he likely faces render Mr. Languerand a flight risk that cannot be mitigated with release conditions. Gov't Opp'n at 18–19. The Court agrees.

First, the nature of the offenses with which Mr. Languerand is charged. Mr. Languerand faces five felony charges carrying the possibility of significant jail time. See Gov't Opp'n at 19 (estimating that "Defendant is facing a sentencing guidelines range of 63–78 months, before the imposition of any upward departures"). And as discussed above, the evidence against Mr. Languerand is quite strong. This combination of a potentially lengthy sentence plus the magnitude of the evidence against him might inspire Mr. Languerand to skip town rather than face the music.

Furthermore, his history and characteristics show that Mr. Languerand has not only the motive but also the opportunity to evade these proceedings. Other than the availability of a home

and job in South Carolina, see Hr'g Tr. at 4–5, Mr. Languerand does not have any significant connection to that state.  This is not a case where the defendant seeking pre-trial release has a wife and two children in the place where his prosecution is pending.  Cf. Vasquez-Benitez, 919 F.3d at 551.  Mr. Languerand is almost entirely unencumbered should he wish to leave South Carolina.[22] Moreover, the limited record before the Court reveals that Mr. Languerand has lived in five different states over the course of his life and has family in both Vermont and Florida, giving him a bevy of options should he wish to flee.  Ex. 2 to Gov't Opp'n at 1–2.  Finally, Mr. Languerand has a history of not attending court proceedings.  Although not a perfect analogue to the present criminal prosecution, Mr. Languerand did not attend the January 2019 hearing on a petition for a protective order against him, despite the fact that he was "provided with reasonable notice of the proceeding."  See Ex. 4 to Gov't Opp'n at 1.  That fact thus weighs somewhat against him as well.

To be sure, certain considerations do weigh in favor of release.  Section 3142(g)(3)(A) instructs the court to consider, inter alia, a defendant's "family ties, employment, financial resources, length of residence in the community, [and] community ties" in assessing if he is a flight risk.  Though Mr. Languerand has not resided in South Carolina for very long, he does have legitimate family connections to the area.  His grandparents continue to reside in Little River, SC, and they have expressed, through defense counsel, a willingness to house and monitor defendant should he be released.  See Hr'g Tr. at 4:3–13.  In addition, defense counsel represented at oral argument that Mr. Languerand's former employer, an excavator, is willing and indeed eager to re-employ him should he be released.  Hr'g Tr. at 4:14–5:1; see also Def.'s Mot. at 11.  Nonetheless,

---

[22] Defense counsel notes that Mr. Languerand is indigent, see Def.'s Mot. at 12, but neither the record nor Mr. Languerand's threadbare assertions support the conclusion that defendant is so penniless that he would be unable to relocate to a new state should he desire.

there is an important difference between reasons to <u>stay</u> in South Carolina and reasons <u>not to leave</u>. In the end, there is little keeping Mr. Languerand in South Carolina should he decide to flee.

In light of the foregoing, the Court finds by a preponderance of the evidence that no conditions will reasonably assure defendant's appearance as required.

## <u>Conclusion</u>

For the reasons explained above, the Court finds based on clear and convincing evidence that defendant Nicholas Languerand's pretrial detention is warranted because he poses a concrete, prospective threat to the safety of the community that cannot be mitigated by any combination of release conditions.  Additionally, the Court finds based on a preponderance of the evidence that no combination of conditions will reasonably assure defendant's appearance at future proceedings as required.  Accordingly, the Court will deny Mr. Languerand's motion to revoke his detention order.  A separate Order will issue on this date.

/s/
_____

JOHN D. BATES

United States District Judge

Dated: <u>August 19, 2021</u>