**United States District Court for the District of Columbia**

**United States of America**        \*

    **v.**                     \*          **No. 1:21-CR-00353-JDB-1**

**Nicholas Languerand**         \*

**Defendant Nicholas Languerand's Sentencing Memorandum, Motion for Downward Variance, Incorporated Memorandum of Law in Support of Motion for Downward Variance, Motion for Credit, and Request for Recommendations**

Table of Contents

Sentencing Memorandum ........................................................................... 1

Motion for Downward Variance ................................................ 17

Memorandum of Law in Support of Motion for Downward Variance ..................... 18

Motion for Credit ................................................................... 26

Request for Recommendations ................................................ 27

Certificate of Service ............................................................. 28

Appendix ............................................................................ App'x

**Sentencing Memorandum**

The Child of Addicts

When Nick was born, his mother was still a teenager, and his father was twenty one. App'x at 5; *see also* Doc. 31 at ¶¶ 44–45. Nick's mother Jenny drank excessively. App'x at 6. Although John Languerand had a strong work ethic, he was seldom sober when he was not working. *Ibid.*; *see also* Doc. 31 at ¶¶ 44–45. John's own father was a severe alcoholic who died of cirrhosis of the liver, when John was twelve. App'x at 6.

Despite Jenny's parents Charlie and Sue Killian's concerns about John's quick temper, controlling manner with Jenny, and his rough and detached manner with Nick, Jenny and John got married about a year after Nick was born.  App'x at 6; *see also* Doc. 31 at ¶¶ 44–45.  They moved into a trailer, parked on the Killian's property and fought frequently when they were drunk.  App'x at 6.

### His Father Tried to Kill His Mother

When Nick was four, his parents fought at Jenny's twenty first birthday party. *Ibid*.  John punched someone's windshield and shattered it.  *Ibid*.  When the Killians heard the commotion, they took Nick to their house.  *Ibid*.  The police issued John a temporary restraining order, barring him from the property.  *Ibid*.  Later that night, John snuck back to the trailer, expecting Jenny would soon return.  *Ibid*.  He released propane gas into the trailer and turned up the heat.  *Ibid*.  At 4:00 a.m., the trailer exploded.  *Ibid*.

John was arrested, charged with arson, and went to jail for six months.  *Ibid*.  While John was incarcerated, Nick would ask questions like, "Why did my dad burn all of my toys?"  *Ibid*.  After John was released, Jenny decided to reconcile with him. App'x at 7.  When Nick saw his father for the first time in six months, Nick exclaimed to his grandmother, "I saw my daddy and I didn't even get a spanking!"  *Ibid*.

Jenny and John soon resumed arguing like before, and they separated.  *Ibid*. Jenny and Nick moved into another trailer on the site of the burned trailer.  *Ibid*. Nick had no contact with his father for another year or so, until his parents' divorce settlement allowed John visitation.  *Ibid*.  After that, Nick's two weekends a month

with his father mostly involved sitting alone in his father's truck all day on construction sites where his father was working.  *Ibid*.

### Had to Change Schools 9 Times, Because His Parents Moved Him 16 Times in 18 Years

Eventually, Jenny met Sean Vance and moved in with him.  App'x at 7; *see also* Doc. 31 at ¶¶ 44–45.  Nick liked Sean.  App'x at 7.  After Jenny learned she was pregnant, she and Sean bought a house, and when Nick was nine, they had K.V.  *Ibid*. Although they got married, bought another house and had another child, Nick was having trouble in school.  *Ibid*.  His grandmother Sue noticed that appeared to be seeking his mother's attention, and he was also trying to win Sean's approval.  *Ibid*. Unfortunately, Jenny was preoccupied with her new children, and Sean was noticeably more affectionate with his biological children than he was with Nick.  *Ibid*.

One day Nick told his grandmother that his mother and Sean were sending him back to his father's house.  *Ibid*.  Nick was crying and his grandmother called Jenny, pleading with her to let him stay with her.  *Ibid*.  Unfortunately, Jenny refused and sent Nick to John's.  *Ibid*.  Nick had to change schools for a third time.  *Ibid*.

When John's probation ended, and he resumed drinking patterns.  *Ibid*.  He also used marijuana and other drugs.  *Ibid*.  Nick was at home alone a lot, because his father worked long hours.  *Ibid*.  When his father was home, he was drunk.  *Ibid*. Nick had no supervision or guidance from John.  *Ibid*.  Nick did his own laundry and made his own meals.  *Ibid*.  Nick told his grandmother about finding marijuana in his father's house, and Nick told his grandparents about the time when his father

and another man got so drunk they passed out. *Ibid*. Nick and a friend then started drinking from the open containers, got sick, and vomited. *Ibid*. When Nick's father attempted to gain custody, the court denied the request, because John had just gotten his fifth conviction for driving while intoxicated. App'x at 8.

When Nick was a high school freshman, he was teaching himself to play guitar and drums and had a small group of friends. *Ibid*. Unfortunately, one day John wanted to know who supplied Nick with marijuana and made a scene outside the principal's office. *Ibid*. Later that day, an administrator found a couple of students with marijuana and suspended them. Rumors spread quickly, because several students had seen and heard Nick's father earlier in the day, and many assumed he had "snitched" on the boys who were suspended. *Ibid*. Nick became a target of bullying. *Ibid*. When Jenny found out, she told Nick he had to move back with her and Sean. *Ibid*. This required changing schools again. *Ibid*.

By the time the school year ended, Jenny was ready to send Nick back to John. *Ibid*. After a month with John dragged Nick out of bed about something, and Nick moved in with his grandparents. *Ibid*. The Killians observed that Jenny and Sean were not inclined to address Nick's ongoing needs, and John was simply unfit. *Ibid*. This required changing schools again. *Ibid*.

When Nick returned to Peoples Academy High School, for tenth grade; some students still considered him a "snitch," and began harassing him. *Ibid*. When Nick stood up to them, there were fights and suspensions for Nick and others. *Ibid*. The Killians became concerned that Nick's struggles had grown too serious for them to

adequately address, especially because they had no legal decision-making authority. *Ibid.*

His New Bed Was a Mattress in a Closet

In the meantime, Jenny and Sean decided to move to Florida, near the ocean. *Ibid.* Nick remembers a lavish apartment, and a teenaged girl next door who played guitar. *Ibid.* Although Jenny agreed that Nick could move to with them in Florida, by the time Nick returned from Vermont with his belongings, Jenny announced that she and Sean were separating. App'x at 8–9. Instead of the lavish apartment with the girl next door, Jenny's apartment was small, run down, and in an unsafe neighborhood. App'x at 8–9. Nick's mother told him one bedroom was hers and the other was for Nick's half-siblings, when they came to stay overnight. *Ibid.* She did not want Nick using his siblings' room when they were not there. *Ibid.* Jenny put a mattress on the floor of the coat closet for Nick. *Ibid.* This move also required changing schools again. *Ibid.*

Jenny was working full-time, and she volunteered to work extra hours, hoping to earn a promotion. *Ibid.* When she was at work, Nick was required to babysit. *Ibid.* Jenny was also seeing a colleague named Ryan, who lived in New York, and Jenny traveled often. *Ibid.*

The size and chaos at Nick's new school for tenth grade was overwhelming. Palm Beach Gardens High School had almost 3,000 students, while Peoples Academy had just over 200 students, and Colchester High School had about 600 students. *Ibid.* Nick stopped attending and became acquainted with older kids, who had either quit

school or graduated.  *Ibid*.  They were mostly unemployed and misusing prescription drugs.  *Ibid*.  When Nick was fifteen, he started experimenting with different drugs and dating began dating Lindsay, who was twenty.  *Ibid*.

When Jenny found a bottle of Adderall that Lindsay had given Nick to hold in his backpack, Jenny called police.  *Ibid*.  Nick was taken into juvenile custody until Sean came and got him.  *Ibid*.  After that, Nick began spending more time at Sean's.  *Ibid*.  Sean allowed him to have Lindsay over, and Sean's apartment was so much nicer.  *Ibid*.

"Boarding School" Turned out to Be a Lie and a Nightmare

After Nick had been in Florida for about three months, Jenny brought up the idea of Nick going away to a boarding school.  *Ibid*.  Soon though, she was having difficulty paying her bills.  *Ibid*.  Jenny lost her apartment and moved back in with Sean too.  *Ibid*.  Although Nick thought they might reconcile, they did not.  *Ibid*.

A month after Nick's 16th birthday, his mother told him they were going to Vermont for a visit, but when they got to the airport, they got into an argument and did not board their flight. App'x at 10.  Early the next morning, Jenny's friend Ryan called Nick and told him that his mother was planning to surprise him with a trip to Las Vegas.  *Ibid*.  The following day, Jenny asked Nick if he wanted to take a road trip with her and Sean to Hoover Dam.  *Ibid*.  He eagerly said yes.  *Ibid*.  A couple of days into the trip, Nick was awakened and told they had reached their destination.  *Ibid*.  When he looked, he saw a gated facility in a remote area.  *Ibid*.  Jenny

announced that it was a boarding school, where Nick would be staying. *Ibid*. Nick was confused and angry. *Ibid*.

When staff came to the car and took Nick inside, locking the gate behind them, he became frightened. Inside, staff immediately shaved Nick's head, took out his earring, and escorted him to a barren room, where he would stay for the next year and a half. *Ibid*.

Cross Creek Academy (CCA), was a WWASP (World-Wide Association of Specialty Programs) school located in La Verkin, Utah. *Ibid*. For several months, Nick tried to keep a low profile and avoid harsh discipline. *Ibid*. He felt traumatized. *Ibid*. After nine months, he was allowed visitors. *Ibid*. His grandparents visited, and Jenny and Sean visited once. *Ibid*. Mrs. Killian recalls not knowing in advance of his placement and that she would be unable to speak with him for so long. *Ibid*. She was relieved to see him. *Ibid*. Although Nick told her he was fine, he seemed subdued and dejected about being unable to leave for another year. *Ibid*.

Although CCA claimed to provide high school courses and award diplomas, public documents reflect that in fact they did not. *Ibid*. The courses did not satisfy high school graduation requirements. *Ibid*. Other survivors have recounted the abuse they suffered. App'x at 25–41.

### Attempting to Pick up the Pieces

In mid-December 2012, after completing the program requirements Nick was returned to Vermont. App'x at 11. By then, his mother was living in New York, and

Sean had returned to Vermont with their children. *Ibid*. Even though Jenny was able to travel to Vermont to visit her children at no cost, she seldom did. *Ibid*. Nick's father had just gotten his 6th driving while intoxicated conviction, a felony. *Ibid*.

Nick lived with his grandparents for approximately four years. *Ibid*. Sue Killian became his legal guardian, so she could re-enroll him in high school. *Ibid*. However, school administrators advised it would be better for Nick to obtain his GED, because of his age and lack of connection with any of the students. *Ibid*. After taking the GED exam and on February 6, 2013, Nick scored 580 in Language Arts/Writing (79th percentile), 590 in Science (82nd percentile), and 620 in Social Studies (88th percentile) and earned his GED. *Ibid*. In addition, Nick took adult education courses through Stowe High School's adult education program, and in June of 2013 earned his high school diploma. *Ibid*.

Nick had always wanted to work side by side with his father, so he was happy when he had the opportunity to operate heavy equipment alongside his father on construction and excavation sites. *Ibid*. Nick also joined The Hardwick Amateur Boxing Club, and competed as a light heavyweight in a Golden Gloves competition. *Ibid*.

Unfortunately, Nick recalls that after work, they frequently drank together in the local bars. *Ibid*. Once they were both drunk, they would fight. *Ibid*. Nick tried living with his father again, but John was staying in a rudimentary structure he had built from downed telephone poles and only had a generator inside. *Ibid*. There was no plumbing or insulation, and it was too cold to live in during the winter. *Ibid*. John

usually simply stayed on couches of friends and co-workers.  *Ibid*.  Nick began dating

Logan Green, and unfortunately relapsed by using of drugs and alcohol.  *Ibid*.

### More Abandonment

In early 2015, after Nick and Logan broke up, he spent that summer living in

the trailer of a woman he had begun dating.  *Ibid*.  That November, he enlisted in the

Army.  In the spring of 2016, Nick went to Fort Bragg, North Carolina, for basic

training.  *Ibid*.  Later, he and Logan reconciled, and she joined him in North Carolina.

*Ibid*.  They got married and found an apartment off the base.  *Ibid*.  Unfortunately,

Logan became homesick, and when they went back to Vermont for Christmas, Logan

decided she was not going to return to North Carolina.  App'x at 11–12.  Nick was

upset and returned to North Carolina alone.  App'x at 12.  Soon, he learned that

Logan was seeing a former boyfriend back in Vermont.  *Ibid*.

In April 2017, Nick went to Fort Benning, Georgia, to attend the Army's

Airborne Course, and earned his diploma on April 21, 2017.  *Ibid*.  Unfortunately, his

mental health and substance abuse issues led to him testing positive for cocaine.  *Ibid*.

In October 2018, he was administratively discharged administratively, under

honorable conditions as a Private, 1st Class.  *Ibid*.

### Still More Abandonment and Isolation

When Nick returned to Vermont in 2018, his grandparents had relocated to

South Carolina, and mother had moved back to Florida.  *Ibid*.  Jenny had married

Joel Gil-Rodriguez, but in less than two years, they divorced.  *Ibid*.  Although Nick

and Logan decided to give their relationship another try, Logan later decided not to.

*Ibid.* For the next couple of years, Nick lived alone in the trailer that he and Logan were going to share. *Ibid.* Although Nick found work with a construction company, he had to stop working when his driver's license was suspended. *Ibid.* He worked as a cook in a local restaurant for several months.

In 2019, Nick met his girlfriend Michelle. *Ibid.* In 2020, he began working for a masonry company raising chickens. *Ibid.* Mrs. Killian recalls Nick telling her during a phone call that she, Mr. Killian, and his animals were "my only family." *Ibid.*

## Into the Abyss

When Nick was laid off in the fall of 2020, his grandmother suggested he move to South Carolina and live with them, because the climate allowed for year-round employment and was less isolating. *Ibid.* Nick did not want to leave Michelle, so he decided to stay in Vermont. *Ibid.* By November, Nick was isolated in the cold, remote trailer with no vehicle and no television. *Ibid.* He began spending all his time on the Internet, consuming information from QAnon and The Proud Boys. *Ibid.*

## Still, There Is Hope

Although Nick asked his girlfriend and grandmother to go to the rally with him, but they did not. App'x at 47. By the middle of January, even though Nick had worked on the trailer, cut wood, and bought a small stove, it was very cold in Vermont. *Ibid.* Nick asked, if he could come to his grandparents' place in South Carolina. *Ibid.*

Once there, he immediately got a job with John Chaves, working hard, sometimes six days a week. App'x at 22, 47. He paid off all of his tickets, repaid his great-grandmother, went to the dentist, took his cat to the vet, and got his cell phone fixed. App'x at 47. At the end of March, Nick and his grandmother went to Vermont, so that he could get his driver's license. *Ibid*. While there, he even helped Logan with a flat tire. *Ibid*.

John Chaves says,

> Nick always showed up on time and was eager to handle the daily work load. Nick never complained about working hard or handling tough tasks. … [John] look[s] forward to [Nick] returning … to our company and the community."

App'x at 22.

Mr. Chaves' son Jonathan says, Nick was

> an asset to our team. Nick showed great effort and cared about the work…. [He] became one of my friends and grew to be someone I spent time with after work. … Nick is a hardworking, genuine, family-oriented, kind person….

App'x at 23.

Michelle says,

> Nicholas is a good, kind-hearted person, who loves his country deeply. His involvement in the Trump movements gave him a sense of belonging and greater purpose. He has longed to be a part of something bigger than himself, and to make a real difference in the world, and that is what he thought he had found. He just unfortunately got sucked into something that was not as it seemed, and quickly got out of hand. He had no plan when attending the January 6th rally….

[Nick has expressed remorse], and genuinely regrets his actions on January 6th.

…

He wants to help people and the community, and put his time and strengths towards something with purpose and meaning.

App'x at 42–44.

Charlie and Sue Killian say,

Nicholas is a smart, hardworking, caring young man.   …   [H]e volunteered to do chores with horses at a stable.  In high school, before leaving for Florida Nick gave all his winter clothes away to friends. After learning to box, he volunteered at a boxing club to instruct youth….   [Sue's] hospice client loved Nick playing guitar for her….   He is a good person.  He helps lead a prayer group in jail.

App'x at 48.

Uncle Charles says, Nick

has always been a hard worker ….   There was never a time that I asked him to help with anything that he hesitated….   [H]e takes direction well and was good about completing the job.

App'x at 49.

Nick hopes to redeem himself.  App'x at 1–4, 22, 23, 44, 48, 49.

Considering:

1.     That Nick is employed;

2.     His demonstrated willingness to work, despite trauma and hardship;

3.     That he has struggled with abandonment, isolation, and drug addiction;

4.     That he has been incarcerated for nine months;

5.      That incarceration for 46–57 months would cost approximately $169,648.00 to $210,216.00 (Doc. 31 at ¶¶ 77, 95); and

For such other reasons as might be raised during the sentencing hearing, a year and a day with credit for time served in custody since April 15, 2021 is sufficient, but not greater than necessary to comply with the purposes of the law.

Application of the Statutory Sentencing Factors to the Facts of this Case

Pursuant to Title 18, United States Code, Section 3553(a), the Court must consider the following factors when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

1.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant:

(a)      Nature and Circumstances of Offense:

Nick pled guilty to a violation of Title 18, United States Code, section 111.  He threw an orange traffic barrier and two stick-like objects, which could have injured someone.  He took a police riot shield, struck it against the ground, and then held it in front of him while confronting officers.  Doc. 31 at ¶¶ 16–18.

(b)      History and Characteristics of Nicholas Languerand:

*See* Sentencing Memorandum, *supra* at 1–12.

2.      The Need for the Sentence Imposed To Promote Certain Statutory Objectives:

(A)      To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;

13

While there is legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law, if the law is merely a means to dispense harsh punishment without considering the real conduct and circumstances involved, then the law promotes derision instead of respect. *Gall v. United States*, 128 S. Ct. 586, 600 (2007).

> (B)   To afford adequate deterrence to criminal conduct;
>
> (C)   To protect the public from further crimes of the defendant; and
>
> (D)   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.    The Kinds of Sentences Available

The Supreme Court severed and excised Title 18, United States Code, Section 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *United States v. Booker*, 125 S. Ct. 738, 756 (2005). This renders the sentencing guidelines advisory. *Id*. Title 18, United States Code, Sections 111, 3551, 3559, 3561, 3571, 3581, and 3583 specify what types of sentences may be imposed for this offense.

Section 111(b) provides for imprisonment, which may not be more than twenty years, a fine, or both. The maximum fine is $250,000. 18 U.S.C. § 3571(b)(3). The law provides for not more than three years of supervised release. 18 U.S.C. § 3583(b)(2).

4.     The Kinds of Sentence and the Sentencing Range Established by
       the Sentencing Commission

### Offense Level

The adjusted offense level is 26.  U.S.S.G. §§ 2A2.2, 3A1.2.

### Acceptance of Responsibility

The offense level is decreased by 2 levels for acceptance of responsibility. U.S.S.G. § 3E1.1(a).  Also, it is anticipated that the government will move for a decrease of an additional level pursuant to Section 3E1.1(b).

Accordingly, the total offense level is 23.

### Criminal History

The Presentence Report indicates "0" criminal history points and a criminal history category of I.  Doc. 31 ¶¶ 35–39.

The advisory Guidelines' range for imprisonment is 46–57 months.

### Supervised Release

Supervised release is required when required by statute or when the Court imposes a term of imprisonment of more than one year.  U.S.S.G. § 5D1.1(a).  The guideline range for a term of supervised release is at least one year and but more than three years, because the offense is a Class C felony.   U.S.S.G. § 5D1.2(a)(2).

Probation

Nick is eligible for probation despite the advisory Sentencing Guidelines.   18 U.S.C. § 3561(c)(1); *but see* U.S.S.G. § 5B1.1, App'n n. 2.

Fine

The Court does not have to impose a fine, when the defendant demonstrates that he is not able to pay, and he is not likely to become able to pay any fine.  U.S.S.G. § 5E1.2(a).  The fine range would be from $20,000.00 to $200,000.00.  U.S.S.G. § 5E1.2(c)(3).  However, Nick is: i) indigent (Doc's 8, 31 at ¶ 70; Min. Ent. May 24, 2021), ii) facing imprisonment, and iii) the Presentence Report indicates that he appears unable to pay a fine.  Doc. 31 at ¶¶ 70–75.  Accordingly, Nick requests that the Court waive the imposition of a fine.  U.S.S.G. § 5E1.2(e).

5.    Any Pertinent Policy Statement

Policy Statements regarding: Mental and Emotional Conditions (U.S.S.G. § 5H1.3), Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (U.S.S.G. § 5H1.4), Employment Record (U.S.S.G. § 5H1.5), Family Ties and Responsibilities (U.S.S.G. § 5H1.6), Military, Civic, Charitable or Public Service; Employment-Related Contributions; Record of Prior Good Works (U.S.S.G. § 5H1.11), and Lack of Guidance as a Youth and Similar Circumstances (U.S.S.G. § 5H1.12) might be relevant.

6.      The Need to Avoid Unwarranted Disparities

Although the guidelines were intended to reduce unwarranted sentencing disparity across the country between similarly situated defendants, there are some guidelines which, as the Sentencing Commission itself has noted, increase disparity. For example, despite the Fair Sentencing Act, cocaine base continues to be punished 18 times more severely than powder cocaine.

7.      The Need to Provide Restitution to Any Victims of the Offense

Although the orange traffic barrier and two stick-like objects could have injured someone, fortunately they did not.

Proposed "Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)" for Sentence below Guideline Range

Considering that Mr. Languerand is employed; his demonstrated willingness to work, despite trauma and hardship; that he has struggled with abandonment, isolation, and drug addiction; that he has been incarcerated for nine months; and that incarceration for 46–57 months would cost approximately $169,648.00 to $210,216.00, a lengthy period of incarceration for Mr. Languerand would be more than is necessary to comply with the directives in Section 3553(a).  In short it would serve no purpose that has not already been achieved.

**Motion for Downward Variance**

Defendant moves for a variance from the guideline range established by the U.S. Sentencing Commission.  *Gall v. United States*, 128 S. Ct. 586, 600 (2007);

*Kimbrough v. United States* 128 S. Ct. 558 (2007); *Rita v. United States*, 127 S. Ct. 2456 (2007).  In support, defendant states that the Court should consider:

1.     The effect of imprisonment on the defendant, his health, and his need for medical care.

2.     A longer sentence would impair defendant's rehabilitation.

3.     A variance is proper to permit more community confinement in lieu of prison.

4.     Prison has greater significance for those imprisoned for the first time.

5.     Disadvantaged childhood, victimization, lack of guidance as a youth.

6.     The defendant's mental and emotional condition.

**Memorandum of Law in Support of Motion for Downward Variance**

Introduction

The departure authority within the Guidelines Manual provides a preliminary basis for  sentences below the Guidelines, but neither counsel nor the Court fulfill their obligations by  considering departures alone.  Counsel must show, and the District Court must consider, all  reasons why a Guideline sentence "fails to properly reflect Section 3553(a) considerations, or  perhaps [that] the case warrants a different sentence regardless."   *Rita v. United States,* 127 S. Ct. 2456 at 2456 (2007).   The District  Court cannot presume that the Guidelines range applies to any particular case.   *Ibid*.  Counsel's  duty extends to challenging the imposition of a Guidelines range sentence by all arguments  available, including Guidelines departures.  There is essentially no limit on the potential factors  that may warrant a departure or non-

18

Guidelines sentence.

Sentencing Pursuant to <em>Booker</em>

In *United States v. Booker*, the Supreme Court held that provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory (18 U.S.C. § 3553(b)(1)), or which rely upon the Guidelines' mandatory nature (18 U.S.C. § 3742(e)), conflicted with the Sixth Amendment (U.S. Const. amend. VI).  125 S. Ct. 738, 756 (2005).   Accordingly, the Court severed and excised the mandatory provisions, "mak[ing] the Guidelines effectively advisory."  *Id*. at 757.

Instead of binding a sentencing court, the Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges.  *See* 18 U.S.C. § 3553(a)(4).  It also permits the Court to tailor the sentence in light of other statutory concerns as well.  *See* 18 U.S.C. § 3553(a); *Booker* at 757.  According to *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in Section 3553(a).

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."  Section 3553(a)(2) states that such purposes are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, Section 3553(a) further directs sentencing courts to consider:

1)     "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1));

2)     "the kinds of sentences available" (§ 3553(a)(3));

3)     "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)); and

4)     "the need to provide restitution to any victims of the offense." (§ 3553(a)(7)).

In addition to considering the factors set forth in Section 3553(a), the court shall "recognize[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582.

The Supreme Court has held that a court may not impose or lengthen a prison term in order to foster a defendant's rehabilitation. *Tapia v. United States*, 564 U.S. 319 (2011) (reversal, because district court lengthened defendant's sentence so she could participate in a residential drug abuse program).

"***No limitation*** shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).  18 U.S.C. § 3661.  This statutory language overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily

relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. § 5H1.12; *see also United States v. Nellum*, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005);; *United States v. Naylor*, F. Supp. 2d , 2005 WL 525409, *2, 2005 U.S. Dist. LEXIS 3418 (W.D. Va. Mar. 7, 2005).

The directives of *Booker,* 125 S. Ct. 738, and Section 3553(a) make clear that courts may no longer uncritically apply the guidelines. Such an approach would be "inconsistent with the holdings of the merits majority in *Booker*, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, directing Courts to consider all of the Section 3353(a) factors, many of which the guidelines either reject or ignore." *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005). Any approach which automatically gives "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass., 2005); *see also United States v. Ameline*, 400 F.3d 646, 655 – 656 (9th Cir. 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), *reh'g en banc granted*, 401 F.3d 1007 (9th Cir. 2005).

Justice Scalia explained the point in dissent from *Booker's* remedial holding:

Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the

statutory range. If the majority thought otherwise – if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed – its opinion would surely say so.

*Booker*, 125 S. Ct. at 791 (Scalia, J., dissenting in part).

Likewise, if the remedial majority thought the guidelines had to be given "heavy weight," its opinion would have said so. The remedial majority understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment. U.S. Const. amend. VI.

A sentencing court must consider all of the Section 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. When the guidelines conflict with other sentencing factors set forth in Section 3553(a), the statutory sentencing factors should prevail. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3rd Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since Section 3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

Supervised release involves significant restraints on a defendant's liberty. Orders confine defendants to a particular community, house, and job at the sufferance of the probation officer. *Jones v. Cunningham*, 371 US 236, 242 (1963); *see also Anderson v. Corall*, 263 U. S. 193, 196 (1923) ("While [parole] is an amelioration of punishment, it is in legal effect imprisonment."); von Hentig, *Degrees of Parole*

*Violation and Graded Remedial Measures*, 33 J. Crim. L. & Criminology 363 (1943).

Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's advice. *Jones* at 242. Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives. *Ibid*. Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison. *Ibid*.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of supervised release. *Ibid*. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid*. Supervised release significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid*.

Effect of Imprisonment on the Defendant and His Need for Medical Care

Federal courts have granted variances after considering the effect of imprisonment on the defendant. A sentence of 60 months' probation was upheld, despite guideline range of 27–33 months, in light of first-time offender's need to continue medical treatment with his psychologist. *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008).

A Longer Sentence Would Impair Defendant's Rehabilitation

Federal courts have granted variances after considering how a longer sentence would impair a defendant's rehabilitation.  *See Gall v. United States*, 128 S. Ct. 586, 593 (2007); *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (variance upheld because it sufficiently reflected the seriousness of the offenses while  allowing the possibility for defendant to reform and go on to a productive life); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (Court's finding that defendant would be better served by outpatient psychiatric treatment, supported reasonableness of imposing five years' probation instead of a guideline term of 41–51 months).

Variance Proper to Permit More Community Confinement in Lieu of Prison

Application Note 6 to United States Sentencing Guidelines, Section 5C1.1 authorizes a departure that permits substitution of  more community confinement than otherwise authorized for an equivalent number of months of  imprisonment for treatment ("e.g. substitution of twelve months in residential drug treatment for twelve months of imprisonment"); *but see United States v. Malley*, 307 F.3d 1032 (9th Cir. 2002) (does not authorize reduction in the offense level).

Prison Has Greater Significance for Those Imprisoned for the First Time

Federal courts have granted variances after considering that the defendant has not previously served time in prison.  *See United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence, justified in part by judge's finding that prison would mean more to this defendant than one who has been  imprisoned before, which resonated with goal of "just punishment" in Section 3553(a)(2)(A) and

"adequate deterrence" in Section 3553(a)(2)(B); *United States v. Jewell*, 2009 WL 1010877 (E.D. Ark. April 15, 2009) (guideline range near the statutory maximum of 5 years was inappropriate for first time offender); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, when advisory range was 10–14 months for defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration).

### Disadvantaged Childhood, Victimization, Lack of Guidance as a Youth

The Sentencing Guidelines treat lack of guidance as a youth and "circumstances indicating a disadvantaged upbringing" as forbidden departure grounds.   U.S.S.G. §§ 5H1.12 and 5K2.0(d)(1).  *Booker*, 125 S. Ct. at 757, and its progeny free district courts to consider these factors as part of their analysis under Section 3553(a).

Federal courts have granted variances after considering the defendant's personal history. *United States v. Santa*, 2008 WL 2065560 (E.D.N.Y. 2008) (variance from the guideline term for a mentally ill defendant's difficult childhood and life— delivered as an infant by his heroin addicted mother, abandoned by his father at age 4, resorted to drugs to overcome emotional trauma of his separation from his girlfriend and the mother of his children); *United States v. Swift*, 2008 WL 2906884 (N.D. Ind., 2008) (departure from guideline range, finding that defendant's lack of

youthful guidance, and acceptance of responsibility indicate that the additional time would serve no deterrent or retributive purpose to defendant or to general public); *United States v. Mapp*, 2007 WL 485513 (E.D. Mich Feb. 9, 2007) (variance based on defendant's upbringing—his parents never married and frequently physically abused each other. He hid in closets or outside for hours and his grandmother took custody of him at age 5 and raised him.); *United States v. Germosen*, 473 F. Supp. 2d 221 (D. Mass 2007) (despite guideline range of 37–46 months, sentence of 2 years' probation with 6 months home confinement warranted partly, because defendant had overcome difficult circumstances of his youth).

### Defendant's Mental and Emotional Condition

At sentencing a court has considered the psychological effects of childhood abuse. *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001).

## Motion for Credit

Defendant moves for credit for time already served in custody since April 15, 2021. In support, defendant states:

7.  He was arrested on April 15, 2021. Doc. 5.

8.  On April 15, 2021the Court entered an Order of Detention. Doc. 18-1.

9.  He has spent time in official detention prior to the date the sentence commences as a result of the offense for which the sentence was imposed. 18 U.S.C. § 3585(b)(1).

10.    The time has not been credited against another sentence.

## Request for Recommendations

Nick asks for the Court's help accessing a psychological evaluation and treatment. The Judgment should direct U.S. Probation to do so. If the Court imposes a term of imprisonment, Nick requests that the Court recommend to the Bureau of Prisons:

11.    designation to the satellite camp at Williamsburg, South Carolina,

12.    credit for time served in custody pursuant to Section 3585(b)(1),

13.    participation in the R.D.A.P. program, and

14.    release to a community corrections facility or to home monitoring as soon as possible.

/s/ *William L. Welch,* III

William L. Welch, III
D.C. Bar No. 447886
wlw@wwelchattorney.com
5305 Village Center Drive, Suite 142
Columbia, Maryland 21044
Telephone: (410) 615–7186
Facsimile: (410) 630–7760
Counsel for Nicholas Languerand
(Appointed by this Court)

**Certificate of Service**

I certify that on this 19th day of January 2022 a copy of the foregoing Sentencing Memorandum, Motion for Variance, Memorandum of Law, Motion for Credit, Request for Recommendations, and Appendix were delivered electronically to Ms. Jessica Reichler (Jessica_Reichler@dcp.uscourts.gov), U.S. Probation Office, E. Barrett Prettyman Courthouse, 333 Constitution Avenue, NW, Suite 2214, Washington, DC 20001, and they were delivered electronically to Mr. Robert C. Juman (robert.juman@usdoj.gov), Office of the United States Attorney, 500 East Broward Boulevard, Fort Lauderdale, Florida 33132.

/s/ *William L. Welch,* III

_____

William L. Welch, III