**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-353-JDB** |
| **NICHOLAS LANGUERAND,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Nicholas Languerand to 51 months' incarceration, three years of supervised release, a fine, $2,000 in restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

Languerand actively participated in the January 6, 2021 Capitol Riots, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.   After watching for hours as other rioters repeatedly assaulted the officers defending the Lower West Terrace entrance to the Capitol – a scene that horrified the rest of the world – Languerand chose to join in.   Languerand put himself among the front ranks of the rioters and threw a variety of dangerous objects at the police.

Languerand's social media posts demonstrate that prior to his arrest, he had no remorse for his conduct on January 6.   To the contrary, Languerand bragged about his assaults on police,

1

posting to Instagram, "I never made it inside but I got some good shots in" and in another post, after recounting his conduct at the Capitol, Languerand said "it felt good."   Languerand said that a merely peaceful protest would not have been successful in pressuring Congress, and posted messages showing that he anticipated and welcomed further violence, telling his Instagram followers that "Violence isn't always the answer but in the face of tyranny violence may be the only answer" and "Next time we come back with rifles."

As discussed below, Languerand's history of violent and threatening conduct, his acts of violence on January 6, and his lack of remorse warrant a significant sentence of imprisonment. Accordingly, the government recommends that the Court sentence Languerand to 51 months in custody, in the middle of the Sentencing Guideline range as calculated by the U.S. Probation Office and as contemplated in the parties' plea agreement.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

On January 6, 2021, several hundred rioters, Languerand among them, attacked the U.S. Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election.   Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked the Capitol Building—vandalizing, damaging, and/or stealing artwork, furniture, and other property.   Although the facts and the circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A

mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough.   As set forth in the PSR and the Statement of Offense incorporated into Languerand's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.   Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election.   By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals unlawfully forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the USCP attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate,

including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.   All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   *See* Statement of Offense at ¶¶ 1-3; PSR at ¶¶ 9-15.

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.   *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117   Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and

is the entrance for the President-Elect and other dignitaries on Inauguration Day.   *See* Figure A.[1]



Fig. A

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the USCP, assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the

---

[1]  Figure A is an image from the website "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.   The archway is circled in red.

law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at    https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer

Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing

7

as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance likely saved the lives of others, including potential harm to members of Congress.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."   *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement.   *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement

officers.  *See id*. at 27-30.   Other rioters, like Languerand, transformed ordinary objects, such as sticks, flag poles, and barricades, into dangerous weapons.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety.  *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.   They caused extensive, and in some instances, incalculable, losses.   This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million.   *See* PSR ¶ 14.

### B.  Languerand's Role in the January 6, 2021, Attack on the Capitol

Languerand traveled to Washington, D.C., by car from Vermont, where he was living at the time.   After attending the former President's rally, Languerand made his way to the U.S.

Capitol.   Languerand spent hours in the area of the Capitol known as the Upper West Terrace ("UWT").   After the riot, Languerand posted to Instagram an image of the Capitol Building with circles indicating the locations on the UWT where he was "hanging out" most of the time, as well as an "X" over the LWT Tunnel, which Languerand said was "the spot where a huge fight between police and PATRIOTS when [sic] on for literally hours.   People died."   In the post, Languerand also lamented that he had lost some "badass photos" he had taken and asked his followers to send him any "good photos" of himself or his "Pepe the frog" flag.   *See* Figure B.



Fig. B

Languerand's admission that he watched the violence against police "for literally hours" is consistent Languerand "selfie" post to Reddit, which, based on the lighting and number of rioters visible, shows that by 3 p.m., Languerand was at the north end of the UWT with a view of the

LWT below him.    See Fig. C.



Fig. C

Approximately one hour later, Languerand on the south end of the UWT, waiving his "Pepe the frog" flag, looking down at the violence occurring at the LWT Tunnel (Figure D).[2]

---

[2] Figure D is a screenshot from a video entitled "354pm" provided to the FBI in connection with a tip.



Fig. D

After the riot, Languerand recorded a video describing his view of the LWT battle, calling it a "straight-up fight" against the police, mentioning specifically the "heave ho" chants of the rioters pushing against police and an incident in which rioters used a ladder as a battering ram to break through the line of police.   *See* Exhibit 1 at 2:10 – 3:15.[3]

But Languerand was not satisfied just to watch the violence; he wanted to take attack the police himself.   By approximately 4:52 p.m., Languerand had come down from the UWT and was on the steps just below the LWT archway.   For the next 10 minutes, Languerand moved in and out of the front line of rioters, taking turns with the other rioters who were relentlessly attacking the police.

At approximately 4:53 p.m., Languerand took a white piece of wood from another rioter

---

[3] Exhibit 1 is a video Languerand posted to his Instagram account at approximately 11:21 pm on January 7, 2021.

and threw at the officers.   *See* Exhibit 2 at :05[4]; Exhibit 3 at :01.[5]



Fig. E

Approximately three minutes later, Languerand and another rioter threw a heavy black audio speaker at the police.   *See* Exhibit 4 at :01;[6] Ex. 3 at 3:28 – 3:30.   Though Languerand was not separately charged with throwing this audio speaker, the government submits this is relevant conduct which the Court can consider pursuant to U.S.S.G. § 1B1.3.

---

[4] Exhibit 2 is an excerpt of a video obtained from the cellphone of another Capitol Riot defendant and designated "1610.mov."   Figure E is a screenshot from :05 into the excerpt.
[5] Exhibit 3 is an excerpt of closed circuit security video ("CCTV") from a camera inside the LWT tunnel during the entire period of Languerand's attacks.   The video from this camera is publicly available at https://youtu.be/_a3RGlu5yLs.
[6] Exhibit 4 is an excerpt of a video obtained from Facebook at https://www.facebook.com/calvin.johnson.5264/videos/158540386049458, entitled "US Capitol Building 7." Figure F is a screenshot from :03 into the excerpt.   The link to the video is no longer active, but a copy of the video was produced in discovery.



Fig. F

Fortunately, the audio speaker hit one of the officers' riot shields rather than an officer.   The

impact was recorded by the body-worn camera of an officer inside the tunnel.   *See* Exhibit 5.[7]



Fig. G

---

[7] Exhibit 5 is an excerpt of body worn camera footage from an officer inside the LWT Tunnel.   Figure G is a
screenshot from :01 into the excerpt.   As discussed below, this speaker appears to be the same as the one thrown by
another Capitol Riot defendant earlier in the day.   At that time, the speaker hit another rioter in the head, drawing
blood.

About one minute later, Languerand threw two sticks in rapid succession at the officers, which landed inside the tunnel.   *See* Exhibit 6[8]; Ex. 3 at 4:35 – 4:40.



Fig. H

Three minutes later, Languerand threw another stick at the officers, which ricocheted off their riot shields.   *See* Exhibit 7 at :01[9]; Ex. 3 at 7:52 – 7:53.



Fig. I

---

A few seconds later, Languerand threw a large orange traffic bollard, which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.   *See* Exhibit 8 at :03 - 07[10]; Ex. 3 at 7:58 – 8:01, Ex. 7 at :09 - :10.



Fig. J

About one minute later, Languerand threw a pepper spray container, *see* Ex. 8 at 1:17 – 1:19, followed by a bottle of liquid.   *Id.* at 1:42.

Approximately 30 seconds later, Languerand threw a piece of wood, *see* Exhibit 9 at 1:03 – 1:06[11]; Ex. 3 at 9:59 – 10:01.

---

[10]  Exhibit 8 is an excerpt of a video entitled 501.mp4 provided to the FBI in connection with a tip.   Figure J is a screenshot from :06 into the excerpt.
[11]  Exhibit 9 is a video from Getty Images designated 1295078236.   Figure K is a screenshot from 1:04 into the video.



Fig. K

A few seconds later, Languerand threw another stick at the police.   *See* Ex. 8 at 2:19 –

2:21 (Figure L); Ex. 9 at 1:18.



Fig. L

As part of his guilty plea, Languerand has admitted that based on the size and weight of

the orange bollard and the stick-like objects, and the speed and force with which they were thrown,

these objects were capable of inflicting serious bodily injury.   *See* Statement of Offense, ¶ 9; PSR

at ¶ 17.

17

After throwing the last item, Languerand took hold of a stolen police riot shield. Demonstrating that he was still ready and willing to confront the police, Languerand slammed the shield on the ground several times and thrust it towards the police.   *See* Ex. 8 at 2:40 – 3:00 (Figure M).



Fig. M

Soon thereafter, law enforcement officers emerged from the LWT tunnel firing tear gas, and Languerand and the other rioters left the area.

## C.  Languerand's Post-Riot Social Media Posts

In the immediate aftermath of the riots, Languerand's social media posts made clear that he was not only proud of his conduct on January 6, but that he was ready and willing to engage in further violence.

In an Instagram post from the evening of January 6,[12] Languerand bragged that he had

---

[12]  The time stamps on Languerand's Instagram posts are in Coordinated Universal Time ("UTC"), which in January is five hours ahead of Washington, D.C. time.   Around the time these posts were made, Languerand had approximately 56 followers observing what he was posting.

attacked the police ("I got some good shots in") and admitted that he had seen the violence that

occurred that day ("it got really violent").   Languerand claimed to have stolen a riot shield and

having been pepper sprayed, but was exhilarated by the experience ("it was lit").   Languerand

also admitted his goal had been to get inside the Capitol ("I never made it inside").

| | |
|---|---|
| **Author** | blessthisimmunity17 (Instagram: 547381000) |
| **Sent** | 2021-01-06 23:57:38 UTC |
| **Body** | There were people being extremely violent but they were tear gassing the onlookers. |

| | |
|---|---|
| **Author** | blessthisimmunity17 (Instagram: 547381000) |
| **Sent** | 2021-01-06 23:57:59 UTC |
| **Body** | No I never made it inside but I got some good shots in. A stole a riot shield got pepper sprayed gassed it was lit |

| | |
|---|---|
| **Author** | |
| **Sent** | 2021-01-06 23:58:19 UTC |
| **Body** | I'm sorry Trump telling ppl to go home was kinda soft |

| | |
|---|---|
| **Author** | blessthisimmunity17 (Instagram: 547381000) |
| **Sent** | 2021-01-06 23:58:49 UTC |
| **Body** | It was after that girl got shot |

| | |
|---|---|
| **Author** | blessthisimmunity17 (Instagram: 547381000) |
| **Sent** | 2021-01-06 23:58:57 UTC |
| **Body** | It got really violent |

In another post, Languerand said there had been an "all out fight between the police

defending the building and the patriots that were there" and bragged that he was "all the way at

the top right on the front lines of it."

> **Author** blessthisimmunity17 (Instagram: 547381000)
> **Sent** 2021-01-07 01:31:56 UTC
> **Body** It was absolutely crazy. There was an all out fight between the police defending the building and the patriots that were there. It ended with the entire crowd - even people who were completely peaceful - getting tear gassed and pepper sprayed.

> **Author** blessthisimmunity17 (Instagram: 547381000)
> **Sent** 2021-01-07 01:32:21 UTC
> **Body** I was all the way at the top right on the front lines of it. Shit was nuts.

A few hours later, Languerand again bragged about how he (and the other rioters) "were straight up fighting these riot cops in the doorway of the capital [sic] building." Languerand proudly proclaimed that "it was fucking insane."

> **Author** blessthisimmunity17 (Instagram: 547381000)
> **Sent** 2021-01-07 03:59:19 UTC
> **Body** I kind of feel like an Antifa pos after all that today but nah fuck that. Guys I was in the shit. I got tear gassed and pepper sprayed. We were straight up fighting these riot cops in the doorway of the capital building it was fucking insane.

Demonstrating his expectation of future violence and willingness to participate in it, Languerand posted, "Next time we come back with rifles.   It's not a game."

> **Author** blessthisimmunity17 (Instagram: 547381000)
> **Sent** 2021-01-07 04:09:00 UTC
> **Body** Next time we come back with rifles. It's not a game.

About twenty minutes later, he posted "This is just the beginning.  We have only just begun to fight."

> **Author**
> blessthisimmunity17 (Instagram: 547381000)
> **Sent** 2021-01-07 04:29:44 UTC
> **Body** This is just the beginning. We have only just begun to fight.

A few minutes later, dismissing the false claim that Antifa was responsible for the riot, Languerand took credit for having been involved in the riot and said "it felt good."

> **Author**
> **Sent**  2021-01-07 04:37:02 UTC
> **Body**  Tell me what you saw if there's anything I can share
>
> **Author**  blessthisimmunity17 (Instagram: 547381000)
> **Sent**  2021-01-07 04:37:23 UTC
> **Body**  I didn't go inside. But I can say one thing for sure, every person
>          that was up there was involved in that. They cannot try to blame it
>          on Antifa. We did that. And it felt good.

The next day, Languerand likened his actions at the Capitol to the American Revolution

and asserted that the violence on January 6 was justified.

> **Author**
>          blessthisimmunity17 (Instagram: 547381000)
> **Sent**  2021-01-07 21:55:47 UTC
> **Body**  The last American revolution was fought with muskets. We didn't
>          peacefully protest. We didn't ask for permission. We picked up
>          rifles and shot the people who were oppressing us. Violence isn't
>          always the answer but in the face of tyranny violence may be the
>          only answer.

On January 7, 2021, Languerand posted a video to Instagram, excitedly describing the

events at the LWT as "absolutely some legendary shit."  Ex. 1 at 3:36-39.

On January 9, 2021, Languerand posted his belief that a peaceful protest would not have

been successful in overturning the election, which is why violence had been justified.   Languerand

said, in part, "Do you think that the people in that building would've been swayed by a peaceful

protest, even there were 2 or even 3 times as many people there?" and "I don't want to sound like

I'm condoning violence . . . . HOWEVER, In the face of absolute tyranny violence is the only

option."  Languerand also made clear that he felt justified in trying to overthrow the government,

noting that while the "Constitution does not say anything about overthrowing the government" he

believed the Declaration of Independence "absolutely does."

| Instagram Business Record | Page 408 |
|---|---|

**Id**
17925692890493847
**Date Created** 2021-01-09 17:00:31 UTC
**Text** Some thoughts... Patriots, do not be lulled into this new age belief that Americans are supposed to be pacifists in the face of tyranny. Many of us know the truth of the assault on American freedom that in many ways is being lead by the CCP. We as a people have inalienable rights to certain things in this country. One of those things is the right to peacefully protest. Another is the right to overthrow a corrupt government.  POTUS and General Flynn knew what was going to happen at the capitol. Even without Antifa there causing ruckus, Patriots still would've stormed that building I have no doubt whatsoever. The energy of that crowd was a force to reckon with. Do you think that the people in that building would've been swayed by a peaceful protest, even if there were 2 or even 3 times as many people there?  You're kidding yourself if you believe that they would've. They weren't swayed by people invading the building, many of who might have actually done harm to them had they gotten ahold of them. People are angry, and rightfully so. We've been treated like deplorables for over four years now. Censored. Told to cover our faces, to close our businesses. Who is the enemy? Who is the enemy? Not a virus.  I don't want to sound like I'm condoning violence.... HOWEVER,  In the face of absolute tyranny violence is the only option. When the powers that be mean to poison us, make us infertile, and kill our children, the MEEK must be strong. POTUS and General Flynn know this, and do not think for a second that they do not support that part of our CONSTITUTIONAL LIBERTY AS AMERICANS.  While the constitution does not specifically say anything about overthrowing the government, The Declaration of Independence, the document that founded this country and established our freedom from tyrants in the first place, absolutely does. U.S Code has it as "organic laws of the United States" and is very much a part of LAW in this country.  We have crossed a threshold. Americans are not pacifists and we will not let you take our freedom, no matter what the price.  You can take that to the fucking bank.

**D.  Languerand's Arrest**

Languerand was arrested in South Carolina on April 15, 2021, at the home of his grandparents, where he had relocated after January 6.  Inside Languerand's room, law enforcement found a large number of weapons, including an AR-15 semi-automatic rifle with magazine, a Stevens 12 gauge shotgun, a Remington shotgun Model 770, a tactical vest, a pistol case, ammunition and brass knuckles.  Law enforcement also found a notebook filled with Languerand's writings, which included references to various conspiracy theories, including the

QAnon conspiracy theory, and a page containing references to "Washington DC Rally 0700,"

"Emergency Supplies," and "Firearms."



Law enforcement also seized Languerand's cellphone, which contained several incendiary

references to the events of January 6 and to the FBI, including:

- An undated note stating "If you are ok with fraudulently certifying an election to win, then I'm ok with attacking a government building to stop you"



- A note from March 25, stating "A poem I wrote:   Dear FBI, if you play nice, so will I. If you shoot my dog, we will all die."



- A note from April 9, stating in part, "The FBI should really find a better hobby than

intimidating and persecuting the patriots who stood up for their constitutional rights and against the seditious infiltration of the psychopathic criminal mafia into the government that they have sworn to protect."



Languerand's cellphone also contained pictures of the leaders of the Proud Boys,[13] the logo of the

militia organization the "Three Percenters,"[14] pictures of Nazi iconography, and several images

of Languerand wearing a Guy Fawkes mask and holding weapons.

 



[13] Proud Boys is a nationalist organization with multiple US chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where they sometimes engage in violence against individuals whom they perceive as threats to their values. The group has an initiation process for new members, who often wear yellow and black polo shirts or other apparel adorned with the Proud Boys logo to events.

[14] Militia extremists sometimes call themselves three percenters ("III%ers" or "threepers") based on the myth that only three percent of American colonists took up arms against the British during the American Revolution. Some III%ers regard the present-day US Government as analogous to British authorities during the Revolution in terms of infringements on civil liberties. While many independent or multi-state militia groups incorporate III% in their unit names, the term is less indicative of membership in a single overarching group than it is representative of a common belief in the notion that a small force with a just cause can overthrow a tyrannical government if armed and prepared.



      With the consent of Languerand's grandparents, law enforcement also searched the trailer in Vermont where Mr. Languerand lived prior to January 6, 2021.   There, agents found more notebook pages containing militaristic language seemingly referring to Washington, D.C.   One page was headed "(Obj Washington) (N & J)."   Another page was titled "Target list" and included subheadings "Attack," "Breach," and "Assault."   Outside the trailer, law enforcement found an old pickup truck and a makeshift target with the rough outline of a human, both riddled with bullet holes.





## III.   PROCEDURAL BACKGROUND

The Department of Justice began its investigation into the attack on the U.S. Capitol mere hours after the breach occurred on January 6, 2021.   As of January 19, 2022, the Department has brought charges by complaint, information, or indictment against approximately 723 defendants. The charges range from Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Assaulting, Resisting or Impeding Law Enforcement, in violation of 18 U.S.C. § 111(a) and (b), to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e).   Of those defendants, as of January 13, 2022, at least 139 have pleaded guilty to misdemeanor charges and at least 24 have pleaded guilty to felony charges.

On April 12, 2021, Languerand was charged by complaint with violating 18 U.S.C. §§ 111(a)(1) and (b), 231(a)(3), 641, 2 and 1752(a)(1), (2), and (4) and (b)(1)(A) as well as 40 U.S.C. §§ 5104(e)(2)(D) and (G).   On April 15, 2021, Languerand was arrested in South Carolina and detained by the magistrate judge.   On May 12, 2021, a federal grand jury indicted Languerand and charged him with violating 18 U.S.C. §§ 111(a)(1) and (b), 231(a)(3), 2 and 1752(a)(1), (2), and (4) and (b)(1)(A) as well as 40 U.S.C. §§ 5104(e)(2)(D) and (G).   On November 3, 2021, Languerand pled guilty to Count 2 of the Indictment, charging him with violating 18 U.S.C. § 111(a)(1) and b.

## IV.    STATUTORY PENALTIES

The defendant now faces sentencing on a single count of 18 U.S.C. § 111(a)(1) and (b). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.[15] According to the PSR, the U.S. Probation Office calculated Languerand's adjusted offense level under the Sentencing Guidelines as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | [14][16] |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | [+4] |
| U.S.S.G. § 2A2.2(b)(7) | Violation of 111(b) | [+2] |
| U.S.S.G. § 3A1.2(b) | Official Victim | [+6] |
| | Total | [26] |

*See* PSR at ¶¶ 24-30.

The government agrees that Languerand has demonstrated acceptance of responsibility for the offense, and that a three-level reduction under Guidelines Section 3E1.1(a) is appropriate. *See* PSR at ¶¶ 32-33.

The U.S. Probation Office calculated Languerand's criminal history as a category I, which is not disputed. PSR at ¶ 38. Accordingly, the U.S. Probation Office calculated Languerand's total offense level at 23, and his corresponding Guidelines imprisonment range at 46-57 months. PSR at ¶ 77. Languerand's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the U.S. Probation Office's calculation.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the

---

[15] Based on the facts and circumstances of Languerand's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4, n.4 (*see* Plea Agreement at ¶5(C)), because a sentence within the Guidelines range is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

[16] The starting point for a violation of 18 U.S.C. § 111 is U.S.S.G. § 2A2.4. Because the conduct constituted aggravated assault, the cross-reference in U.S.S.G. § 2A2.4(c)(1) requires the application of U.S.S.G. § 2A2.2.

offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).   As described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

## A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

As set forth in the Statement of Offense, Languerand purposefully joined a large group of rioters that was intent on interfering with the nation's electoral process.   Languerand and the other rioters not only imperiled core democratic functions but also collectively caused enormous emotional, physical, and financial injuries along the way.   Languerand's actions on January 6 did not just violate the law, they showed an absolute disregard for the rule of law

While each defendant should be sentenced based on his or her individual conduct, each individual who participated in the riot did so under the most extreme of circumstances, to which their conduct directly contributed.   Anyone who made it to the Capitol would—at a minimum— have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In the instant case, these factors militate strongly in favor of a significant term of incarceration.

First, while Languerand did not enter the Capitol, it was not for lack of trying. The assaults at the LWT Tunnel in which Languerand participated occurred precisely because the officers there were protecting that entrance to the Capitol from the rioters intent on entering. Languerand's Instagram post from immediately after the riot that he "never made it inside" further demonstrates that this was his goal.

Second, Languerand deliberately and repeatedly engaged in violence. Like every other rioter, Languerand contributed to the collective threat to democracy, physical safety, emotional well-being, and property on January 6, 2021. But Languerand is among the most serious offenders because Languerand chose to use violence. *See United States v. Munchel*, 991 F.3d

1273, 1284 (D.C. Cir. 2021) ("those who actually assaulted police officers . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way").   While no specific injury has been attributed to his conduct, again, it was not for lack of trying.   Even if they did not cause specific injury, each of Languerand's attacks contributed to the overall assault, and each made it more difficult for the officers in the LWT Tunnel to defend themselves from other attacks.

Indeed, Languerand may well have planned for violence by bringing a firearm to the Capitol.   His notebook contained a reference to the "Washing DC Rally" just above a reference to "firearms."   In an Instagram post from the evening of January 6, 2021, in response to a friend stating he wanted to carry a gun to the inauguration on January 20, but did not have a concealed carry ("CC") permit, Languerand claimed that he had been carrying a firearm while at the Capitol on January 6, 2021.

**Author** v0ic3l3ss (Instagram: 40327711144)
**Sent** 2021-01-06 23:55:05 UTC
**Body** Wow that is so amazing. I'm trying to plan to be downtown on the 20th but I gotta find a few patriots to buddy up with. I don't have a CC permit and I don't want to go down there alone. But I think we r gonna see a LOT happen before then too so we will see!! 🇺🇸🇺🇸🇺🇸🇺🇸🇺🇸

**Author** blessthisimmunity17 (Instagram: 547381000)
**Sent** 2021-01-06 23:55:24 UTC
**Body** I carried today

Languerand also recorded an Instagram video in the late evening of January 8, 2021, in which he claimed to have bought a gun to the Capitol.   *See* Exhibit 10, at 4:22 ("I had a gun on me, too").[17] While the government cannot substantiate Languerand's claim, this evidence raises a significant

---

[17]  Exhibit 10 is a video posted by Languerand to his Instagram account at approximately 11:19 p.m. on January 8, 2021.

concern that Languerand was armed on January 6.

Regardless of his level of planning prior to January 6, once at the Capitol he made a conscious decision to engage in violence.   Languerand watched the violence against police for hours.   Instead of leaving or at least standing back, he put himself at the front of the line.   His assaults on law enforcement were not spontaneous or provoked, they were deliberate and premeditated, and cannot be ascribed to the heat of the moment.   Nor did Languerand stop at just one attack during the riot.   He chose to engage in violence repeatedly, and, unlike some of the other rioters, Languerand chose to use dangerous weapons capable of causing serious bodily injury.

Third, while Languerand does not appear to have specifically destroyed property, he used property that had already been destroyed by other rioters – the audio speaker ripped from its housing, and sticks and wood broken off from furniture – as weapons against the police.

Fourth, Languerand's reaction to the violence he saw on January 6 was not horror or disgust, but excitement and a desire to contribute to the violence.   Even after the riot was over, Languerand did not feel shame or guilt – he was proud of his actions and he relished the chance to engage in further violence.   The notes found on his cellphone at the time of his arrest demonstrate that even months after the riot, Languerand still felt justified in his violence.

The Fifth and Sixth factors are inapplicable.   There is no evidence that Languerand destroyed evidence, and thankfully Languerand did not make it inside the Capitol, though again, not for lack of trying.

Seventh, as discussed, Languerand's statements on social media in the immediate aftermath of the riot demonstrate not only a lack of remorse, but that Languerand was proud to have engaged

in violence against law enforcement on January 6, and that he anticipated and welcomed further violence.

Eighth, Languerand did not cooperate with law enforcement.   Languerand did not speak to law enforcement at the time of his arrest, and though many other Capitol Riot defendants have provided information to law enforcement since their arrests, Languerand has not done so.   To the contrary, the notes found on Languerand's cellphone indicate that his hostility to law enforcement, and particularly the FBI, has not abated.

Ninth, though Languerand has accepted responsibility for his actions by pleading guilty, prior to being arrested and facing significant prison time, Languerand never expressed remorse or contrition for these actions.

Accordingly, the nature and circumstances of the offense amply support the recommended 51-month sentence.

**B.      The History and Characteristics of the Defendant**

Languerand's crime on January 6 was not an isolated event in an otherwise law-abiding life, but rather the latest act in a pattern of misconduct and violence that has persisted throughout his life, based on Languerand's demonstrated willingness to allow his personal beliefs to override the rule of law.

As the Court noted when considering his motion to revoke detention, "over the past several years, Mr. Languerand has exhibited a distinct tendency towards threatening and violent conduct." DE 23, at 15.   In 2019, he was the subject of a protective order issued by the Vermont Superior Court based on a complaint alleging a pattern of threats, harassment, and stalking.   *See id*. Among other things, the complaint alleged that Languerand had sent "threatening texts saying he

is going to kill me, himself, or other people I associate with," and it related one particular incident when Languerand repeatedly threatened to kill the complainant if she attended a certain party. *See id*. at 15, n. 16.   Three months later, Languerand was charged with aggravated assault for an incident in which he beat an acquaintance while they were both riding in a car.   *See id*. at 16.

As the Court also noted, Languerand "has a pattern of following conspiracy theories into belligerent confrontations with the people around him." *Id*.   In particular, Languerand follows the QAnon conspiracy theory, and is preoccupied with false allegations of pedophilia and child sex trafficking.   In the months preceding January 6th, for instance, Languerand "yell[ed] at [Black Lives Matter] protestors about pedophilia," and left a menacing voicemail for a Morristown, VT, city employee about purported pedophilic symbols on road barriers, telling the employee that "[Languerand] will be watching [him] and knows what he looks like."   Languerand repeatedly threatened the proprietors of a pizza restaurant via messages on Instagram before "[coming] to the restaurant and . . . shouting about how they were running a child sex slave operation in their basement," leading the Sheriff's Department to tell the local police that "they deal with [Languerand] on a frequent basis, all for similar behavior."   *Id*. at 16-17.

Languerand's history also demonstrates "a deep distrust and hostility toward law enforcement."   *Id*. at 17.   On March 3, 2019, Languerand "became extremely hostile" during a traffic stop, "yell[ing] and scream[ing] profanity at [the officers]" and later telling them that he "hates cops."   In May 2020, Mr. Languerand told a sheriff's deputy responding to a call that "he didn't give a fuck who [the deputy] was and what [he] was doing."   Then, when Languerand's

dog approached the officer, in a statement presaging the "poem" he wrote about the FBI in March 2021, Languerand said "if you shoot my dog I'll shoot you." *Id*. at 17-18.

While Languerand served in the military, which might ordinarily be a mitigating factor, "it also raises the question as to why one who had that training, took those oaths, would nonetheless engage in this kind of conduct." *United States v. Nelson and Markofski*, 21-cr-344 (Bates, J.) (Dec. 10, 2021 Sentencing Transcript) ("Nelson Tr."), at 48.   Moreover, his military service lasted only three years before terminating in an administrative separation due to his drug use.

Languerand's unique history of threats and violence distinguish him from other Capitol Riot defendants and weighs heavily in favor of a lengthy term of incarceration.

## C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[18]   As this Court has stated, it was "a riot, or an insurrection, that undermined our electoral process."   Nelson Tr., at 41.

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration.   As Languerand entered the Capitol grounds and watched law enforcement officers being assaulted, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege by others similarly willing to use force to undermine the election.   Law enforcement officers were overwhelmed, outnumbered, and

---

[18] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) , available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

in some cases, in serious danger.   Languerand saw that situation and instead of feeling sympathy for the police, he decided he wanted to join in the attack.   Assaulting law enforcement officers with a dangerous weapon is the epitome of disrespect for the law.

Accordingly, the government submits that this factor requires a lengthy sentence of imprisonment.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[19]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.   The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the

---

[19]   *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

transfer of power.   As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.   It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Languerand's willingness to translate his personal beliefs in to violent and threatening actions, his history of violent and aggressive behavior before January 6, and his remorseless attacks on law enforcement on January 6, all demonstrate that a significant term of incarceration is required to deter Languerand from future acts of violence.

Moreover, there is nothing in the record to indicate anything changed for Languerand after January 6. To the contrary, his post-riot social media posts and the notes on his cellphone show that he continues to espouse the same conspiracy theories which he believes justified his violent conduct on January 6 and before. They also demonstrate the same hostility towards law enforcement which has pervaded his criminal history. While Languerand is free to express his beliefs, this Court can and should take his statements into account when assessing the need for specific deterrence.

## E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See*

40

> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one."   *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.   This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.   In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6) – the need to avoid unwarranted sentencing disparities – the crimes that Languerand and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other assaults on law enforcement in other cases.   To try to mechanically compare other defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, there have been only two other sentencings for Capitol Riot defendants convicted of violating 18 U.S.C. 111(b).   Both cases illustrate why the government's recommended sentence would not result in any unwarranted sentencing disparities.

In *United States v. Thompson*, 21-CR-461 (RCL), the defendant, like Languerand, engaged in violence against officers defending the LWT Tunnel.   Thompson assisted the mob by helping take riot shields from the law enforcement officers and bringing other riot shields forward for rioters to use against the officers.   Thompson also joined in an effort by the mob to jointly push together against the front-line officers in an effort to force their way through the police. Thompson helped fellow rioters by helping them throw a large audio speaker toward the police line (which, ironically, struck one of the rioters, drawing blood).[20]   Finally, Thompson acquired a police baton and struck once at a law enforcement officer, hitting that officer in the hand.   See Government Sentencing Memorandum, 21-cr-461-RCL (DE 30), at 9-27.   Like Languerand, Thompson faced a sentencing range of 46-57 months.   Judge Lamberth rejected Thompson's request for a departure or variance, and sentenced Thompson to 46 months imprisonment.

A number of factors warrant a higher sentence in this case.   Thompson's minor criminal history was non-violent, and did not contain anything remotely similar to Languerand's history of violent and threatening conduct.   Unlike Languerand, Thompson did not brag on social media about his conduct on January 6 and did not express a willingness to engage in future violence. Moreover, unlike Languerand, Thompson was extremely cooperative with law enforcement. Thompson approached law enforcement immediately after he learned the FBI was looking for

---

[20] As noted previously, the audio speaker appears to be the same as the one which Languerand himself would later throw at officers in the LWT Tunnel.

information about him, and agreed to be interviewed in the hopes of aiding law enforcement in the investigation, though Thompson's information did not rise to the level of substantial assistance. Finally, Thompson took the extraordinary step of agreeing to plead guilty before he had even been charged with a crime.

In the other Section 111(b) case, *United States v. Palmer*, 21-cr-328 (TSC), the defendant, like Languerand, was convicted for throwing objects at law enforcement officers inside the LWT Tunnel.   Specifically, Palmer threw a pole at the officers, and then sprayed the contents of a fire extinguisher at them, before throwing the fire extinguisher.   At the time of sentencing, Palmer's sentencing range was 63 to 78 months because Palmer's post-plea conduct resulted in a denial of any reduction for acceptance of responsibility.   Having found the higher guideline sentencing range applied, Judge Chutkan rejected Palmer's request for a downward departure or variance and imposed a sentence of 63 months.

Languerand's conduct involved throwing more items at the police, for a longer period of time.   Moreover, Palmer's history did not include the kind of violent and threatening behavior that Languerand has consistently engaged in, and Palmer did not express pride in engaging in violence the way Languerand has.   Languerand's conduct therefore fully warrants the recommended sentence.

## <u>CONCLUSION</u>

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 51 months, which is the midpoint of the Guidelines range as calculated by the U.S. Probation Office and as agreed upon by the parties in the plea agreement.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/   Robert Juman*
        ROBERT JUMAN
        Assistant United States Attorney
        Bar No. NJ 033201993
        United States Attorney's Office, Detailee
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (786) 514-9990
        E-mail: Robert.juman@usdoj.gov

44